# NEW COLONIAL COMPANY, LTD.,
*v.*
# CANOVANAS SUGAR FACTORY, LTD., ET AL.

No. 229, Equity.

1. Latimer, Hoard, Fernandez, and Borda being the joint owners each of one fourth of a sugar estate in Porto Rico, mortgaged it to Lanman & Kemp, and, being indebted to the Colonial Company, Ltd. (predecessor of the New Colonial Company, Ltd.), entered into an agreement to run for twenty years, in accordance with which a holding and operating company (the Canovanas Sugar Factory, Ltd.) was organized; said owners conveyed their property to said Canovanas Sugar Factory, Ltd., and received shares of stock, which they transferred to the Colonial Company, Ltd., to hold until the debt to it should be paid; eight or nine shares were issued originally to the Colonial Company, Ltd. The latter selected all the officers of the Canovanas Sugar Factory, Ltd., and through it had absolute management and control of the estate. During the twenty years the Colonial Company purchased the Lanman & Kemp mortgage for less than its face, and a year or two before the end of the twenty years filed a suit to foreclose it for its face value, making only the Canovanas Sugar Factory, Ltd., defendant. The heirs of Latimer, Hoard, and Fernandez asked leave to intervene. Borda's interest had been purchased by the New Colonial Company, Ltd. The court allowed certain parties to intervene and to file cross bills, and, on accounting, the New Colonial Company, Ltd., endeavored to charge compound interest on its credits, including the face value of the Lanman & Kemp mortgage, and to have the court hold that it was not a trustee for the heirs of Latimer, Hoard, and Fernandez. While the suit was pending, and just before the twenty-year term was up, the New Colonial Company, Ltd., and the Canovanas Sugar Factory, Ltd., extended the term of the agreement for five years additional, and thereafter from year to year, as the parties might agree.

2. The right to charge compound interest not having been stipulated, it cannot be charged.

New Colonial Co. v. Canovanas Sugar Factory.

3. The agreement being silent as to interest on certain items, the creditor has a right to simple interest thereon, less such payments as may or should have been made on the principal from time to time.

4. The Colonial Company, Ltd., was a trustee and controlled said property for the benefit of the heirs of Latimer, Hoard, Fernandez, and for Borda.

5. That the New Colonial Company, Ltd., having succeeded to the rights and duties of the Colonial Company, Ltd., and having purchased the interest of Borda, it thereafter was a trustee for the benefit of the heirs of Latimer, Hoard, and Fernandez to the extent represented by their respective stock interests, subject to the debts due it by them.

6. That the Colonial Company, Ltd., and afterwards the New Colonial Company, Ltd., being trustees, as aforesaid, had no right at any time to foreclose the Lanman & Kemp mortgage, but that, if the latter at any time had such a right, it was extinguished by the agreement extending the twenty-year agreement.

7. As an accounting might have shown that nothing was due from interveners to plaintiff on account of its payments for the Lanman & Kemp mortgage, the interveners could not have been required to deposit in court the amount alleged by plaintiff to have been paid for the same.

8. That the New Colonial Company, Ltd., still continues to be a trustee for the benefit of said parties, and that the character of its possession has never been changed.

9. That the court will make such further orders as may be necessary as to accounting, costs, etc., and that meanwhile the New Colonial Company, Ltd., shall continue in possession of the property as trustee of a going concern.

Opinion filed September 29, 1906.

---

*Francis H. Dexter, Esq.,* for plaintiff, New Colonial Company, Ltd.

No appearance for defendant Canovanas Sugar Factory, Ltd.

New Colonial Co. v. Canovanas Sugar Factory.

*J. F. P. des Garennes, Esq., Chas. Hartzell, Esq.,* solicitors for interveners.

RODEY, Judge, delivered the following opinion:

The complainant is an English corporation with headquarters in London, England, and doing business there and also in the West Indies and South America as sugar merchants and planters. For convenience, we will refer to it as the English company.

The concern, along in the forties of last century, was a firm known as Cavan Bros., and, with some changes, continued to be thus known until some time in the sixties, when the immediate predecessor of the complainant was organized and was known as the Colonial Company, Limited. This concern, and all the concerns of which it was the successor, had for many years been financial and credit backers, agents, and consignees of certain Americans and Porto Ricans doing business on the island, particularly one William H. Latimer, one Charles Alexander Hoard, and one José Ramón Fernandez, the latter known as the Marqués de la Esperanza, and their succession, and all hereafter referred to, for convenience, as the Porto Ricans.

In about the year 1879, it transpired that certain of these Porto Ricans found themselves heavily indebted to this English company, and they made a strong effort to, in some manner, pay it. In an effort to do this, an agent of theirs, Wenceslao Borda, to whom they gave a quarter interest in their enterprise, because he had spent something over $50,000 bringing it about, went to the city of New York and borrowed some $200,000 from a firm of chemists known as Lanman & Kemp, and with the money the Porto Ricans built a sugar factory at Canovanas,

New Colonial Co. v. Canovanas Sugar Factory.

Porto Rico, on properties belonging to themselves, and, with the aid of Lanman & Kemp, proceeded to manufacture sugar in an effort to recoup their losses of previous years and be enabled to pay their debts. Their effort was a disastrous failure, and, in 1883, they found themselves still in debt to the English company, with whom some of them had had some dealings in the meantime, the same as before, with interest added, and their debt to Lanman & Kemp and the latter's friends increased to $340,000. About this time or before, certain of the Porto Ricans failed in business. The English company then sent an agent out to Porto Rico, who looked over the ground, and on his return to London, negotiations were opened with Lanman & Kemp and the parties in Porto Rico with a view to some settlement by which the estate in Porto Rico could be made to pay some portion of the immense debts it was subject to. The result of the negotiations was that, what is known as "the contract of 1883," but which was to be effectual as of date, September 30, 1882, in this litigation was entered into. It is set out in full at the end of this opinion. The exact meaning of this contract is the principal bone of contention in the whole controversy. It is filed as an exhibit in the case, is referred to in practically all of the pleadings, and portions of it are set out at length in all of the briefs and written arguments. Under its terms, the English company organized another English company for the Porto Ricans; this latter company to be known as The Canovanas Sugar Factory, Limited. The Porto Ricans deeded their equities in their sugar lands and factory to this new concern, and Lanman & Kemp also deeded it all their rights which they held under their mortgage, thus vesting it with complete and unencumbered legal title to all of the property in Porto Rico concerned in this controversy. Then this

New Colonial Co. v. Canovanas Sugar Factory.

new company gave a new first mortgage back, on the whole property, to Lanman & Kemp for the full amount due them, some £68,000, so that it left but three parties to deal about the matter in the future, or perhaps only two, under the circumstances, that is, the English company, the new corporation, and Lanman & Kemp. The capital stock of this new company consisted of 10,000 shares of the par value of £20 each, or a total capital of £200,000. The shares were issued as fully paid, to the Porto Ricans, in consideration of the conveyance of the property to the new company. The English company and those of the Porto Ricans who were indebted to them, then compromised their debts in a manner satisfactory to themselves, their agreements apparently all merging in this contract of 1883,—the English company taking the stock of this new company from those of the Porto Ricans who were indebted to it, as security for the amounts thus compromised respectively, all as set out in detail in the contract.

The English company organized this new English corporation for the Porto Ricans, and made themselves its officers, and kept its office right there in London, in their own office, so that it was practically one set of men running two different corporate entities. The Porto Ricans received each one fourth of the capital stock of this new company, less one or two shares each, leaving some eight qualifying shares to be held by these members of the English company who composed the directorate, officers, and managers of this new company that had been organized. The Porto Ricans then stepped down and out entirely, save as owners of equities in the capital stock. This contract of 1883 contains twenty-two sections and two schedules, and sets out with very considerable detail the agreements of the parties. A reading of it is necessary to an understanding of

New Colonial Co. v. Canóvanas Sugar Factory.

what is here expressed. It gave the Porto Rican properties entirely and absolutely into the exclusive management and control of the English company for a term of 'twenty years, without let, hindrance, or interference of any kind or character by the Porto Ricans, the new company, or anybody, save Lanman & Kemp, and, of course, as the same parties were officers of both the English companies, they could look after the whole matter in their own way. They at once sent out a manager to Porto Rico, who took possession, and has managed the property, kept it up, paid the taxes in the name of The Canovanas Sugar Factory, Limited, and generally improved and conducted it ever since, shipping all of the product to the United States.

Under the terms of the contract, the English company was to make certain payments of interest and principal annually to Lanman & Kemp and certain other payments to themselves and others. They were to at once advance quite a large sum of money to renovate and bring the sugar plant in Porto Rico up to date, and were to get it back with interest in a certain way specified in the contract. The English company was to receive, as its remuneration, 4 per cent on the gross proceeds of the estates and factory, and 2½ per cent commission on the invoice cost of machinery, stores, and supplies purchased for the business.

The contract, almost in every section, provided that Lanman & Kemp, the holders of the first mortgage lien, were to have prior rights and could foreclose their mortgage on almost any sort of a contingency or default. The English company proceeded to carry out the provisions of this contract, but it proved a loss from the very start, as sugar took a drop in price in about the year 1884, and the price continued to remain low for sev-

New Colonial Co. v. Canovanas Sugar Factory.

eral years thereafter. The contract provided for the payment of some annuities to certain of the Porto Ricans, during their lives, out of the profits, but, there being no profits, and two of the parties to whom it was to be paid having almost immediately, or shortly thereafter, died, and another some time later, they were relieved of that part of the requirement. In about the year 1888, notwithstanding the renovation of the sugar plant at the beginning, in 1883, and later, the business still continued to be conducted at a loss, and the English company, under the terms of the contract, gave notice to Lanman & Kemp that they would give the effort up. They afterwards withdrew this notice for a year or so, but at the same time they opened correspondence with Lanman & Kemp, which strung out over about a year, with a view to purchasing the Lanman & Kemp mortgage outright. They finally succeeded in purchasing it on long time at £24,000 net, or about one third of its face value, without interest. They went on running the factory and the sugar plantation with its own income, as far as possible, until 1895, without paying anything to anybody, except these payments and interest thereon, made to Lanman & Kemp, on the purchase price of the mortgage, which they claim were paid with their own money. In the latter year, they completed their payments and received a full and absolute assignment of the mortgage of Lanman & Kemp to themselves, but still continued to conduct the sugar factory and plantation the same as before.

In or previous to 1897, it appears the English company failed; but, under certain English laws and proceedings, a new concern was organized, having substantially the same stockholders and officers, known as the New Colonial Company, Limited, and it, through what appears to have been proper process, became the successor of the old company and stepped

New Colonial Co. v. Canovanas Sugar Factory.

into the shoes thereof, and finally became the complainant in this case. This new English company was, it appears, composed of the officers of the old company, so the change really made no difference. It proceeded conducting the sugar factory in Porto Rico the same as the old concern had done, and its officers continued to at all times hold meetings of themselves as The Canovanas Sugar Factory, Limited, whenever any formality was necessary, or anything was required to be done or recorded on account of the Porto Rican end of affairs. Shortly after the Spanish-American War, and the signing of the treaty of peace, Porto Rican sugar was admitted to the United States free of duty, and, presto, prosperity dawned upon The Canovanas Sugar Factory, Limited, and its business.

Since 1883, many of the original English company officers and stockholders have passed away. All of the original Porto Ricans have died. The defendants and cross-complainants here, some twenty-eight or thirty of them, are their heirs. The Porto Ricans originally interested all died within so short a time after the making of the contract of 1883, and their estates in Porto Rico and elsewhere were so mixed, and their heirs, who in many cases were women and infants, were so scattered over the world, in Porto Rico, Spain, and the United States, that little or no attention was paid to the doings of the Englishmen in either of their corporate capacities, either in England, New York, or Porto Rico, from 1883 until about 1899, save that one of the original Porto Ricans, who owned the quarter interest, Mr. Borda, kept in communication with them and had considerable dealings with the English company, and finally sold his interest outright to them. In the latter year, a grandson of the Marqués de la Esperanza, the defendant José Ramón Fernandez Savage, wrote a letter to the new English company in con-

New Colonial Co. v. Canovanas Sugar Factory.

sequence of some information he obtained in New York about their purchase of the Lanman & Kemp mortgage, and made some inquiry about it, but received a reply that this new English company did not think the price paid for it concerned him or any other of the heirs. From this time on, matters began to be more or less looked into, and the Porto Ricans began to make some inquiry of the new English company about its conduct of affairs, but no result came from it. The new English company continued to run the Porto Rican sugar business, and it claims that it sent to Porto Rico yearly statements to its own agent to be given to the original parties interested.

In September, 1901, the complainant, this new English company, as alleged owner and assignee of it, filed a short bill of complaint in this court to foreclose the Lanman & Kemp mortgage, but cited only the agent of The Canovanas Sugar Factory, Limited, here on the island, with process, because it made only The Canovanas Sugar Factory, Limited, a defendant, it being in law the owner of the equity of redemption, and the heirs of the original Porto Ricans having only an equity in the capital stock. In due course, it took a decree *pro confesso* against such defendant, and a decree of foreclosure of the mortgage was about to be entered for its full face value, with 6 per cent interest since its date in 1883. About this time, certain of the defendants saw an advertisement or notice in one of the local newspapers of the intended sale of the property, or of the doing of something with reference to it, and came in, and petitioned the court for leave to intervene on behalf of these parties who had deeded the property to the English corporation many years before, to be thus managed for twenty years, which had not yet elapsed. The court, after full hearing, set aside the decree *pro confesso,* and permitted them to come in. Then en-

New Colonial Co. v. Canovanas Sugar Factory.

sued a large amount of amendments, new suits, cross bills, demurrers, orders, motions to strike, etc., etc., until the record became one of the largest that has ever been filed in this court, and finally the court consolidated the whole matter into one suit with a new amended bill and new amended answers and a cross bill.

The court is of opinion that, no matter what errors or mistakes may have been made with reference to, or in or about the pleadings, all the parties now before the court were necessary parties from the first, and as the pleadings are all properly rewritten to conform to the evidence, and all the proofs, facts, and circumstances are in evidence and before the court, they will all be allowed and permitted to stand, and the rights of all parties settled.

Along in 1904 and 1905 the cause came to an issue, and a large amount of evidence was taken here in Porto Rico and many papers and exhibits introduced in evidence, and one of the complainant's counsel from Porto Rico, and one of the cross complainants' counsel from New York, went to London, and there another large batch of papers and records was introduced in evidence, and another large amount of evidence was taken, reduced to writing, and brought back here and filed in court.

This was the condition of the matter when the present judge came upon this bench in June, 1906. Shortly thereafter, the cause was set down for argument on the merits. It was argued by several very able counsel for all the parties during seven or eight days of time, day and evening sessions, and thereafter, counsel for all of the parties filed, in writing, elaborate arguments and briefs; and the pleadings, as stated, were, by leave, finally all rewritten and amended to conform to the proofs, so that the controversy stands to-day, submitted upon a

New Colonial Co. v. Canovanas Sugar Factory.

finally amended bill, answers, and cross bills, each of which is an elaborate and carefully prepared pleading in itself.

The court has seldom known a case presented more elaborately or with such uniform courtesy by counsel, and desires at this place in this statement, to tender its acknowledgments to all of them in that behalf.

Despite the short time before our fall vacation that the court has had to devote to an examination of the record, the pleadings, the exhibits, the briefs, the authorities, and the transcribed arguments, yet it has gone through them in order to understand intelligently the situation of all the parties and what took place, in so far as shown by the record, concerning the matters here in controversy during the more than twenty years since the making of the contract of 1883.

Notwithstanding the very large balance that was due from the Porto Ricans to the original English company in 1879 and up to 1883, when it was compromised down as stated, the court is of opinion that equities, on the whole, are pretty nearly equal, because, from the record of the evidence taken, it is certain that the large balance of 1879 was made up of balances due from immense and profitable transactions that took place through a long series of years of dealing between the Englishmen and the Porto Ricans in the sales of merchandise at a profit, and in the compounding of interest on at least yearly rest balances from year to year. But whatever the rights, equities, or claims on either side are, they were, in the opinion of the court, merged in the contract of 1883, and that and the mortgage are the foundation of all their rights here.

It can be said also that even if the present defendants and respondent heirs of the Porto Ricans can be said, from the English point of view, not to be entitled to much sympathy, because

New Colonial Co. v. Canovanas Sugar Factory.

of not having borne any brunt or hardship of the business during the last two decades, and because their rights come to them as heirs only, and because their ancestors failed in business in and around 1879, still, from the Porto Rican point of view, a somewhat similar opinion can be entertained as to the Englishmen, who themselves failed and went into liquidation, and who are at the present time, in all probability, largely heirs and successors of former owners, and are perhaps, although this is not certain, as far as the court is informed, it being only an inference from the allegation of the bill, now the beneficiaries themselves of whatever compromise, if any, they made of their affairs and debts in the reorganization in 1897, from the Colonial Company, Limited, to the present complainant, the New Colonial Company, Limited. But be that as it may, it is alleged that the present complainant has received up to date, perhaps not less than $200,000 in the way of commissions on the product of the factory and plantation through all the years, and on commissions on all the vast amount of supplies it bought for and shipped to the same, out of the moneys thereof. In fact, it is stated in one of respondents' briefs, that up to the year 1904 it had received $156,000 on the sugar commissions alone. And further, because it appears from the evidence unquestionably, that these percentages of commission were unusually large; and further because, thanks to the change from adversity to prosperity of the concern, the English company is now in a position to collect, with interest, every dollar it ever expended since the making of the contract of 1883, on account of the Porto Ricans, and that 6 per cent interest continuously for twenty years on large sums, when the prevailing current rate was often less, for considerable periods, gives complainant a great advantage, and that it has, in fact, already collected a very

New Colonial Co. v. Canovanas Sugar Factory.

large amount of money of both advances and interest in that behalf, from the proceeds of the product of the factory and plantation, as, it is alleged, an accounting will show; and besides many salaries collected for its secretaries, managers, etc., etc., through the years, is itself the owner now, through having purchased the interest of the fourth partner, Mr. Borda, of a one fourth interest in the factory and plantation, which is now vastly improved and increased in value through expenditures made upon it largely, and eventually it will be entirely, out of the proceeds of the plantation itself.

The complainant claims as its absolute right in this proceeding, under the law, the contract of 1883, and a custom of merchants in London:

1. To foreclose the mortgage for its full face value with interest thereon to the date of the decree, at 6 per centum per annum, instead of having to foreclose it for the amount it paid for the same, with interest.

2. To collect the full amount of its account current and "special outlay," under the contract of 1883, with yearly rests and compound interest thereon.

3. To carry the accounting down only to the date of the filing of the suit to foreclose the mortgage in September, 1901, and keep for themselves the nearly half a million of dollars profit realized on the product of the factory and plantation since that date to the present time and date of decree; and

4. To have a decree in its favor declaring it entitled to retain in its possession the three fourths of the capital stock of The Canovanas Sugar Factory, Limited, and to have a lien thereon for the whole or any balance of the moneys due it and secured by the estates of the Porto Ricans, as set out in sched-

ule two of the contract of 1883, with interest on all such amounts since the date of the contract.

The respondents or defendants deny complainant's right to foreclose the mortgage at all, on the ground that it is perhaps already paid; or for any amount more than the £24,000 which complainant paid for it with interest; and on the ground that complainant, by an agreement with the respondent, The Canovanas Sugar Factory, Limited, made by themselves with themselves, at their offices in London, in December, 1902, knowledge of which was brought out in the proofs, which will be hereafter referred to, waived any right, if any they ever had, to foreclose it even for the amount they paid for it, and continued the contract of 1883 for five years from its expiration in 1903 until 1908; and further, on the ground that the complainant never, in fact or in law, became vested with the power to foreclose it at all during the life of the contract of 1883, which was paramount, or any extension thereof.

They also emphatically resist any claim that the complainant is entitled to the benefit of any account stated, so as to fix yearly rests therein and compound the interest on the balances alleged to be due thereafter, but insist that a complete accounting for all the years is still due from the complainant to these defendants, with simple interest on the special outlays and on any portion of the account current that is definite enough in itself to bear a fixed date, but all to be subject to credits accruing from the product of the factory and plantation from time to time during the several years, and that complainant is entitled to no interest whatever on the amounts of $114,582 (pesos) due from the Hoard interest and $192,583 (pesos) due from the W. H. Latimer interests, because, as they say, no interest is mentioned or provided for in the contract.

New· Colonial Co. v. Canovanas Sugar Factory.

They say that with these legal questions and equities, which they contend ought to be decided in their favor, it will appear on an accounting between the parties, to be hereafter taken, that they owe practically nothing to the complainant at the present time on account of said mortgage, and that they will have as an offset to whatever balances, if any, they do happen to owe to the complainant, a three-quarter interest in the capital stock of The Canovanas Sugar Factory, Limited, which has for its basis a vastly improved and valuable sugar factory and plantation at Canovanas here in Porto Rico, which is now, they allege, easily worth, as a whole, nearly a million of dollars, and which is paying a net profit, as they claim, of about $125,000 annually, unless the same should happen to be eaten up by the balances shown on the accounting under schedule two.

Elaborate and strenuous argumentative effort has been made all through this controversy and in the recent hearings and briefs by complainant's counsel to establish certain propositions:

1. That the contract of 1883 did not make of complainant a trustee, and that therefore it is not bound by the unquestioned rule of equity that a trustee cannot, under circumstances like these, purchase an outstanding mortgage at a discount and charge its face value to his *cestui que trust*. And, in any event, complainant denies that, even if it is a trustee, the circumstances are such as to prevent it from buying this mortgage at a discount and being entitled to foreclose it at its face value. And it contends further, that under clause 19 of the contract of 1883, which will be hereafter referred to, it was given specific leave by the ancestors of these defendants to purchase the mortgage in question with its own money, as best it might, and become subrogated to all the rights and powers of foreclosure

II. Porto Rico.—14.

New Colonial Co. v. Canovanas Sugar Factory.

of the same, at its face value, and that it is now, and has 'been since September, 1901, a mortgagee in possession with condition broken.

2. That the complainant, under the contract of 1883, is a "consignee," and that this word, under the custom of the merchants of London with reference to West India sugar plantations, has a peculiar legal meaning which gives the right to the consignee to have a lien superior to every existing title, mortgage, or other claim on the plantation and factory, to which he makes advances, under what is known as the salvage rule; and further, to a right to state accounts annually or oftener, add the unpaid interest to the balance, and compound it for interest thereafter.

In other words, the complainant contends that no other relation than that of debtor and creditor has ever existed between it and the defendants as to the main debts mentioned in the contract of 1883, and no other relation than consignee with regard to the products of the factory and plantation.

The respondents insist that the complainant is not only a trustee in the fullest sense, but one that has imposed upon it in all its dealings and doings under the contract and the peculiar situation of the parties, good faith of a most delicate character, even to a greater extent than that which obtains with reference to guardian and ward, in the most conscientious court of chancery; and that as to whether or not the complainant is consignee or mere agent is immaterial, because they say that, under the contract of 1883, compound interest or yearly rests are, either by implication or expressly, excluded, and that nowhere in the contract of 1883 is complainant given the right to purchase the Lanman & Kemp mortgage with power to speculate on it or to foreclose it before the end of the twenty-year period

New Colonial Co. v. Canovanas Sugar Factory.

mentioned; and that its possession is the same now that it was when it first entered into possession in 1883, and that nothing has ever occurred to in any manner change the trust, the relation of the parties, or the possession.

Discussion and Review of Evidence, Circumstances, and Facts.

Before passing upon the legal questions involved or making the findings of fact and law that are, in the opinion of the court, proper, it may be well to consider some of the results that will follow the action of the court in that regard.

The sums mentioned and still claimed by the complainant in schedule two of the contract of 1883, with simple interest at 6 per cent per annum thereon from the date of that contract, would make the amount not less than $728,000. The respondents, of course, claim that an accounting will show that this has been largely reduced. And it must be remembered, also, that the word "dollars" as between the parties to this contract in 1883 meant pesos, which, it is said, had a much less value than the American dollar of to-day. Evidence Sir Nevile Lubbock, p. 76.

If the Lanman & Kemp mortgage is to be permitted to be foreclosed for its face value of about £68,000, or $340,000, it would make of itself, with interest for all the years, a sum in excess at the present time of $800,000. This amount would, of course, also be subject to such credits as might be properly put against it under the contract. But if the Lanman & Kemp mortgage is to be foreclosed only for the amount of £24,000, which complainant paid for it, or about $120,000, and some additional interest, then that amount, at simple interest, if nothing has been paid on it, would amount at the present time

New Colonial Co. v. Canovanas Sugar Factory.

to about $285,000. The respondents also claim that probably this sum has already been entirely paid off, or nearly so, and that an accounting will show that.

It might be well not to forget that money out at 6 per cent interest, in twenty-three years, is, including the principal, paid nearly two and a half times when finally paid off; so, if the respondents should win on every point they make in the controversy, they would still have paid every dollar or peso they agreed to pay the complainant in the contract of 1883, and every dollar the complainant has since paid out on their account, either for special outlay, carrying on the factory and plantation, or for the Lanman & Kemp mortgage, nearly two and a half times at the date of the decree, and in addition, will, as it is said, have paid them in commissions of 4 per cent on the sugar produced, which the evidence shows is quite high (that 2½ per cent is regular), and in commissions of 2½ per cent on all the machinery and supplies purchased during those years, an additional sum of about $250,000; so it is not impossible that, under all the circumstances, the English company would be an absolute gainer, even counting everything these defendants or their ancestors ever owed it, even if it loses on every point it makes here. And besides, the one quarter interest in the factory and plantation, now admittedly owned by the complainant, has been vastly increased in value, and probably a portion of that value at the cost of the interest of these defendants in the estate, depending on the time of the purchase of the Borda interest, and depending on whether money was wisely expended, and the improvements made were really necessary.

As we view it, the making of the contract of 1883, unless it was intended by it to preserve a reversion for the Porto Ricans and their heirs, was a work of supererogation. The friendly

New Colonial Co. v. Canovanas Sugar Factory.

feeling between them was such that, indeed, it is more than likely that there was a direct understanding between the Englishmen and the Porto Ricans, that the former would protect them against Lanman & Kemp, and that this was one of the main objects of the making of the contract of 1883. As well might the Porto Ricans, unless they desired to keep this reversion for themselves and their heirs, have made a deed outright at once of the whole property to the English company and rendered unnecessary the creation of the holding company and all the provisions of the contract of 1883. It is manifest, also, to the mind of the court, that the one of all others who had the whip handle and call on proceedings at the time of the making of that contract was Lanman & Kemp of New York, the mortgage holders. Provisions for their protection are in every section of it, and these provisions are the one thing that detract from its smoothness of phrase. When that agreement was being drafted, they called in their solicitor, a Mr. Rawlins, who is still alive, and who testified in the case, his evidence beginning at page 303 of the record, and, as he testifies, his whole object while superintending the formulation of that instrument was to so word it that by no hook or crook could the absolute rights of Lanman & Kemp become affected, either through any advances made by the English company, or otherwise. In fact, he states on page 307: "I was not going to take any chance. I knew the then judge of the encumbered estates court, and I had talked the matter over with him on several occasions, and he said: 'As long as I am here, I am going to uphold the consignee's lien.' "

This witness's entire testimony sustains this position of this court, and, as a consequence, throws light upon what counsel on

opposite sides have strenuously contended is the meaning of clause 19 of the contract of 1883.

The fore part of that clause unquestionably provides that if the English company should advance any money to prevent Lanman & Kemp from becoming entitled to enforce all or any of their rights, powers, or remedies under their mortgage, that in such case, next under Lanman & Kemp, the property of The Canovanas Sugar Factory, Limited, should be security for its repayment to the English company, and interest thereon at 6 per cent, and that the Canovanas Company should then execute a second mortgage or lien therefor. Then follows the celebrated proviso which is such a bone of contention in the controversy. We quote it: "Provided, also, that the Colonial Company, Limited, shall be entitled at any time, upon giving to Lanman & Kemp six calendar months previous notice in writing of the desire of the Colonial Company, Limited, to have an assignment of Lanman & Kemp's mortgage, to have, at the cost and expense in every respect of the Colonial Company, Limited, at the expiration of the said six months, the said mortgage and the principal and interest moneys secured thereby, assigned to the Colonial Company, Limited, or its nominees, upon payment to Lanman & Kemp of the principal money then due and owing under the said mortgage with the interest thereon up to the time of the assignment and all proper mortgagees' costs and expenses." : : :

The contention is that the language there used, "to have, at the cost and expense in every respect of the Colonial Company, Limited, at the expiration of the said six months, the said mortgage, etc., assigned," gave a direct authorization to the English company, even though it is a trustee, to buy this mort-

New Colonial Co. v. Canovanas Sugar Factory.

gage at any time, step into the shoes of Lanman & Kemp, and foreclose it without regard to any right of the Porto Ricans.

To our mind, every word in this proviso was intended to mean, and does mean, that the Colonial Company, Limited, could secure a six months option on that mortgage at any time on giving the proper notice, and that everything connected therewith, the making of the papers and the recording of the same in England and out in Porto Rico, etc., etc., must be at its own cost as against Lanman & Kemp. Were it otherwise, in order to overthrow all the other provisions of the entire contract, its twenty-year term, and all the other provisions in it and duties connected with it, including the restriction of the equity rule that a trustee cannot speculate with, or make profit out of, claims against the property of his *cestui que trust,* which was as well known to those English lawyers there present as it is to any American lawyer, these astute gentlemen who formulated that instrument would surely have added right there at the end of that proviso, the usual words, which every lawyer knows would have suggested themselves on the spot, as follows: "And thereupon, the said Colonial Company, Limited, or its successors or assigns, shall become vested with all the rights, powers, and privileges of foreclosure, etc., in the said mortgage contained, the same as the said Lanman & Kemp would have been in the absence of the assignment, and may immediately, or as soon thereafter as they choose, at their option, proceed to foreclose the same against the Canovanas Sugar Factory, Limited, without reference to whether the twenty-year term has elapsed or not."

The evidence taken in the cause in London shows, as stated, that the Englishmen and the Porto Ricans held each other in the highest esteem, and this is also made manifest by the large

credits extended to the ancestors of these respondents by the older English concerns. But were not this fact in evidence, a reading of the contract of 1883 would make it certain. No one can read that contract without appreciating the fact, under all the circumstances, that the Englishmen stood between the Por-to Ricans and Lanman & Kemp to protect them from the foreclosure of that mortgage as best they might. The first portion of clause 19 shows plainly that the fact the Englishmen might have to advance large sums of money out of their own pockets to Lanman & Kemp to keep the latter from foreclosing was talked of and was in contemplation of the parties, as it is mentioned in the contract itself. The fact the assignment of the mortgage was to be made to the Colonial Company, Limited, or its nominees, as provided in the closing words of clause 19, is not, in the opinion of the court, of much importance, because that word "nominees" is used also in other places, notably in clauses 5, 21, and 22, and appears to be used in not any very definite sense, and only out of an abundance of caution. The English company might have required to have it made to one of its clerks, for reasons of its own; or, had the English company failed before the purchase of the mortgage, as it did in fact afterwards fail, it certainly would have desired to be in a position to name its own successor to receive the assignment. In fact, all that kept that very thing from occurring in this very case was the fact that the assignment of the mortgage was made just before the English company failed or was reorganized. In America, the words used would have been, "or its assigns," instead of nominees.

To appreciate how fully the English company was put in possession of the property of the Porto Ricans, and how little the Canovanas Company meant, one has but to read § 7 of the

New Colonial Co. v. Canovanas Sugar Factory.

contract. Under that section, the Porto Ricans simply stepped out of the equation for twenty years. They didn't even keep anybody on guard in the new corporation created for them, to audit their accounts or protect their interests. This shows the confidence they reposed in the Englishmen. Not one of them remained as an officer of the new company, and the contract devests them for the twenty years from being able to elect any officer in that corporation, that might be solely interested in looking out for their interests. It will be noticed that in clause 22 of the contract, the English company as pledgee is empowered to vote the stock of the Porto Ricans the same as if the latter had not any interest therein. This provision that a mere pledgee should be the person to vote the stock at elections of the corporation was unusual.

One's mind cannot grasp the situation of these parties without coming to the conclusion, and that unhesitatingly, that the English company was, in the fullest sense, created a trustee of an express trust, by the Porto Ricans under the contract of 1883, and left to manage their affairs for twenty years. The main dread of the Porto Ricans was of necessity the Lanman & Kemp mortgage. The Englishmen were their friends. Therefore it does not appeal to the court's conscience that they should be permitted to grasp this mortgage as a weapon with which to wipe out of existence all equities and rights of the people they were supposed to be helping. If it is to be conceded that the English company, under all the circumstances here, had a right to speculate on this mortgage on the theory that anything they could do to save themselves some of the debt due them is legitimate, then, if they took that sugar factory and employed the large number of men necessary to conduct it and agreed to pay them one rate of wages, and then, either designedly mis-

New Colonial Co. v. Canovanas Sugar Factory.

managed the plant so that it became embarrassed, or if it be-
came embarrassed in the regular course of business without
their fault, and they had bought up the wage claims of the help
at a discount and charged it all in the accounts of the concern at
the regular rate, no counsel would have had the temerity to
come before the court and argue that the transaction was legit-
imate or that it could be done even under a mere agency, let
alone a trusteeship. If, in the same way, the factory had re-
quired a new set of boilers or other sugar plant machinery, and
the management had bought them at one price, which was ex-
tremely low, through the chance of finding somebody who had to
sell, and then charged for them at their real value, or even at
a low value, but more than they paid for them, in the accounts
of the management, no one would contend that it was legiti-
mate. Yet the chancellor here is asked to countenance the pur-
chase of this mortgage by the English company without the
knowledge of the Porto Ricans, and without notice to them, at
a tremendous discount, on seven years time, and to continue the
conducting of the Canovanas sugar plantation during those
seven years while they were paying for this mortgage by instal-
ments, still without notice to the Porto Ricans, and then to
charge a profit of $220,000 on it, with interest on $340,000 for
twenty-three years. It would be unconscionable. It is, of
course, unfortunate that Lanman & Kemp lost so heavily in the
matter, because there is no intervening relieving feature of
profits on merchandise or through sugar commissions as to
them, but the final sale was their own deliberate act and they
made no reservation in the assignment. But that is no reason
why the profits from their loss should all go to the English com-
pany, unless the law and the situation of the parties warrant

New Colonial Co. v. Canovanas Sugar Factory.

it. To permit this sort of thing to be done would, in the opin-
ion of the court, put a premium on mismanagement.

Without for a moment intimating that any such thing was
done, or even thought of, it can be seen that the English com-
pany, being in the complete control in which they were of the
Canovanas factory and property, without let, hindrance, or su-
pervision of anybody over them as to the conduct or manage-
ment, because it is manifest the Canovanas corporation was a
mere figurehead. It did no business after its organization, the
organization was simply kept up as a legal formality. And
with the heirs of the original Porto Ricans scattered through
Porto Rico, Spain, and the United States, and the majority of
them helpless women and children, they might have, with a
view to disgusting and disheartening Lanman & Kemp into a
sale of their mortgage for much less than its face value, pur-
posely mismanaged the property, and of course this mismanage-
ment would all this time have militated against the rights of
the Porto Ricans, and then, after securing the contract of pur-
clause from Lanman & Kemp of the mortgage, could have con-
tinued for the entire seven years while they were paying for it,
to mismanage the property purposely and waste the estate of
the Porto Ricans, so as to prevent them from going into court
to enjoin the proceeding or from tendering into court the
amount of money that the English company was paying for
the mortgage and asking to be declared the beneficiaries of the
extremely low purchase themselves, or from asserting these
rights as a defense to the foreclosure of the mortgage, the mo-
ment that the English company came into court to foreclose it.

Or they could, during those seven years, if their position is
right, have gone on improving the premises with the estate's
money, only to take it over to themselves after they completed

their purchase of the mortgage. This sort of temptation put upon trustees and all persons acting in a fiduciary capacity towards others is the foundation for the rule in equity that is unquestioned in any court, which prevents parties occupying such trust relationship to another, from being permitted to speculate in claims against the property they are guarding. It would be hard to find a more complete exposition of the leading cases in the law, sustaining this equity rule, than is made in this very cause in the briefs of counsel for respondents. And the court, after a careful examination of the subject, is surprised at the unanimity of courts of equity in holding to the rule. It might be well here to say that, in the opinion of the court, none of the cases wherein the Supreme Court of the United States has held that a trustee might buy a claim against the estate in his hands, as to its facts, at all approaches the relations of the parties in the case at bar. Passing the subject for the present, the court will take occasion later in this opinion to cite some of them.

The contract of 1883, in the opinion of the court, is a plain and simple one. It is rather crudely drawn, notwithstanding the undoubted eminence of the specialists who drew it, and in some of its sections it is clumsy. Section 18 occupies nearly a whole page, and they are long pages in the print at hand, and there is not a period in the whole section until the proviso at the close of it is reached. It requires considerable mental effort to understand that particular section. No difficulty, in the opinion of the court, would have arisen, or ought to have arisen, in connection with this contract. Anybody of intelligence can take it, go into possession of that sugar factory, and live up to its every term for the twenty years without any difficulty. It appears to the court—and this is said with all due.

New Colonial Co. v. Canovanas Sugar Factory.

deference to the high standing of these English gentlemen—that the idea of making this profit out of this mortgage was an afterthought. Sir Nevile Lubbock testifies that the reason they did not foreclose immediately after getting the assignment of it in 1895, and deferred the same until 1901, was because they were afraid of the Spanish laws in Porto Rico. See p. 80, his evidence. In other words, they did not think they would get "a square deal," here on the island in those days. Yet, surely, from the time they bargained for it in 1888 or 1889, up to the time they finally purchased it, after slow and small payments, in 1895 or 1896, they could have found somebody among the heirs to notify that the mortgage could be purchased for such a small amount. And good faith and common business fairness, considering their position and friendship for the Porto Ricans, whether they were to be considered trustees or mere agents, required that the moment they got the right to purchase it from Lanman & Kemp for the £24,000, they should have notified some of the Porto Ricans that it was for sale at that small figure, and given the Porto Ricans an opportunity to furnish the money themselves for it if they could have done so. So far as the Porto Ricans were concerned, to protect them against the danger of this mortgage was what they employed the English company for, and paid them large commissions. To purchase it at less than its face value, if they could, was, in the opinion of the court, almost as much a moral, if not a legal, duty on their part as it would be to buy the supplies of the concern as cheaply as they could and to sell the product of the factory at as high a price as possible. We say that this ought to have been done in the absence of any question of trusteeship at all, under all the circumstances here.

It will not do to say that the only consideration for the

New Colonial Co. v. Canovanas Sugar Factory.

Englishmen taking hold of this sugar factory in the first instance was in a desperate effort to save some of their large debt to themselves. That was only one of the reasons. On the contrary, Sir Nevile Lubbock and others testified in the cause in London, as shown by the record, that they verily believed it would be profitable; and that, because they so believed, they advanced under the contract of 1883, seventy-five thousand dollars (£15,000) at once to put it in shape to make what they expected would be large profits, owing to the then prevailing price of sugar, which unfortunately soon dropped off. The evidence of these London gentlemen also shows that at that very time they were making large profits out of their Demarara and other sugar plants in South America and the West Indies, and that they attributed the failure of the Porto Ricans and Lanman & Kemp to make a success of the factory in question, to the fact that Lanman & Kemp were chemists, and not sugar men, and that the Porto Ricans were hampered by poverty, and because the plant itself needed renovating. Therefore, the reversion saved to the Porto Ricans by the contract of 1883 was a material consideration in contemplation of the parties at the time of the making of the contract. And the English company was made trustee because the Porto Ricans would not give up the entire property to them. It must not be forgotten, in considering the relations of these parties, that the contract was for twenty years and that it was made for that long period with a view to withstanding ups and downs. The first ten or twelve years were certainly downs, and now it is as decidedly the other way. The contract was a whole, and not intended to be broken off, unless the prosperous period had come at first and had actually resulted in the paying off of the debts and the property reverted to the owners, or unless the Englishmen had backed.

New Colonial Co. v. Canovanas Sugar Factory.

out of the whole, or some portion of it, under a provision of the contract to that end. It must not be forgotten either that the failure to make a profit in the first half of the time the contract had to run, the same as the Englishmen were making in the other sugar properties they were managing, may to some extent have been the fault of the Englishmen themselves in not at once renovating the plant to the extent they ought to have done. In fact, Sir Nevile Lubbock very honestly states this to be the fact, on page forty-one of his testimony. I quote from him: "I am bound to say, although it is rather giving ourselves away perhaps, that in my opinion if we had spent more capital on that factory in the early years, the result in the end would have been much better; but we had not got the capital, and the Canovanas company had not the capital, and the succession of George Latimer & Company, if they had got it, did not make any effort to produce it, and I think the factory suffered from that. I think that this is borne out by the figures, because when we did put down the new things in 1896 you will see that, whereas the cost of manufacture had been running from £5 10 to £7 up to that period, it at once dropped to £4, £3 18, and so on, showing the immense importance of having an amply supply of steam."

Neither must it be forgotten that the truth of this statement of the witness is emphasized by the fact that the English company was so financially embarrassed itself that it failed or was reorganized about that time, or a little later; so it will not do to say that it has always done what it might have done by the property.

Neither is it quite right to give too much importance to the fact set out in the testimony of the Englishmen, which appears all through the record, though doubtless true, that they felt they

New Colonial Co. v. Canovanas Sugar Factory.

were the owners of this property from the start; because, while they might make good profit handling it, they never expected the Porto Ricans to be entitled to anything in it. It may be possible that they had this idea because the sums of money against the property at the start were certainly extremely large; then the Porto Ricans who signed the contract of 1883 having faded out of existence by deaths, and the condition of their heirs, gave the Englishmen more right, perhaps, to have this idea; but there was one party, Mr. Borda, who owned the quarter interest in the stock of the Canovanas Company, with whom the English company kept up continuous correspondence, and, through their agents in Porto Rico, had dealings in the way of buying and selling real estate, and finally bought his entire interest in the capital stock of the Canovanas Company, and are still the owners of it.

At this point, let us pause to state that nothing in this opinion is intended to, in any manner, reflect on the character of the English gentlemen composing the directorate of the Colonial company, Limited, or its successor, the New Colonial Company, Limited, or their counsel. On the contrary, a reading of the record, as well as the admissions of counsel for respondents during the argument on the hearings, will convince anyone that they are gentlemen of honor, of the very highest social and business standing, and that the Porto Ricans have always entertained the highest opinion of them and of their counsel, and of their integrity and business ability, and also of the local managers. In this, the court heartily joins. During the argument we were inclined to lean toward their contention of their right to foreclose the mortgage at its face value, but an examination of the authorities has convinced the court that both

New Colonial Co. v. Canovanas Sugar Factory.

these gentlemen and their counsel, as well as the court, were mistaken in that regard.

As proof that the English company, through its managers, had no confidence in its right to foreclose the mortgage in question at all even, much less for its face value, and were loth to stand on their rights in that regard, if they had any, it developed on the trial that on the 4th day of December, 1902, at its offices in London, about one year and two months after the English company, as assignee of the Lanman & Kemp mortgage, had filed its suit in this court to foreclose the same, called a meeting of the two corporate concerns, that is, the managers of the complainant here, who really compose the officers of The Canovanas Sugar Factory, Limited, also,—called the meeting, as stated, and took up the matter of the contract of 1883, which had but two months additional time to run before it would expire by limitation, and extended it for five years from the date of its expiration; that is, from February 3, 1903, to February 3, 1908, and, after the expiration of such additional five years, from year to year, until determined on the 30th day of September in any year by either party giving to the other six calendar months previous notice in writing, but providing that before the notice by the Canovanas Company should be effective at any such time, it must have paid to the English company all that it owed it. A copy of this agreement in detail is annexed to this opinion. Further, in the year 1903, some two years after the filing of the suit to foreclose the Lanman & Kemp mortgage, the New Colonial Company, Limited, addressed a letter to the Canovanas Sugar Factory, Limited, which, of course, was a letter written by themselves to themselves, by these gentlemen, requesting the latter company's leave to buy some new machinery (p. 171, record) for the factory. This

II. Porto Rico.—15.

New Colonial Co. v. Canovanas Sugar Factory.

showed them still in possession of the property and acting under the contract of 1883.

Some years ago, a former judge of this court, as appears from his opinion in the files, when refusing the application of respondents for a receiver, gave as one of his reasons for the refusal, that he understood the complainant had abandoned its claim to foreclose the mortgage for more than they paid for it. Complainants say the court had no authority from them to make this statement.

For its splendid care and management of the estate, at least in recent years, the New Colonial Company, Limited, is entitled to all credit from the respondents and the court.

Despite the size of the record and the complications that, as the court believes, unnecessary pleadings have temporarily read into the cause and injected into this litigation, the court regards the whole controversy as practically an unnecessary one, founded on the mistake of the New Colonial Company, Limited, as to its supposed rights in the purchase of this mortgage and in the charging of compound interest. We do not feel, therefore, that the court is doing any favor to the Porto Ricans by this decision or any wrong to the complainant company in the premises. The parties made their solemn contract and are bound by it. Therefore, the decision is, as the court believes, strictly on the facts and the law as our lights give us to see it, and we do not feel, paraphrasing the brief of counsel for complainant, that any substantial right has been controlled by any fancy, impression, or sentiment of the court.

The respondents, on learning of the extension of time of expiration of the contract of 1883, expressed their ratification and acceptance of the same, and, by leave for that purpose first had, amended their pleadings and say they are satisfied

with the management of the Canovanas Sugar Factory here in
Porto Rico, and are desirous that it should be kept up; and
that, if it shall develop on the accounting, which they request
may be ordered by the court, that they still owe anything to
the New Colonial Company, Limited, complainant here, they
are willing the complainant shall so remain in possession dur-
ing all the remainder of said extension of five years and any
additional time that may be necessary to complete accounts and
equities between the parties.

## The Matter of Simple and Compound Interest.

An examination of the matter brings the court to the con-
clusion that the claim of these respondents that the English
company should not be allowed any interest upon the two claims
mentioned in schedule two of the contract, to wit, that due
by the heirs of Charles Alexander Hoard, amounting to $114,-
582 (pesos); and that due by the heirs of William Henry Lat-
imer, amounting to $192,583 (pesos), because it is not specif-
ically set forth in any part of the contract that the same should
carry interest, would be quite as inequitable upon their parts as
are the claims of the complainant to foreclose the mortgage for
its face value. Whether mentioned or not, it can and ought to
be presumed that the English company, or even the Porto
Ricans, did not intend, at the time of making that contract,
that in case of such a contingency as this, the Englishmen
should not recover any interest on these large sums of money
for more than twenty years. Such a claim would be quite as
unconscionable as anything in the controversy.

A great deal of controversy has taken place through this
litigation on the question of the right of the English company

to charge compound interest on its yearly statements by adding any unpaid interest to the principal at every resting period of this alleged accounting, and then having that interest bear interest with the principal to the period of the next alleged accounting, and thus collect what would amount to a large sum of money in the way of compound interest.  The solicitors who testified in the cause in London seem to say that there was nothing in the laws of England in 1883 to prevent compound interest, and all of the English witnesses who testified show that there existed a custom of merchants with reference to the West India trade, in London, that authorized this compounding yearly at least, and some of them went so far as to say that in some cases it was done semiannually.  The briefs of respondents show that the laws of Spain in force in Porto Rico at that time, if it was material to hold that they could govern, did not permit, but in fact, prohibited, compound interest.

However, a Mr. Braithwaite, who testified from p. 174 to p. 211 of the London record, who has been the solicitor for the complainant company since 1885, would not give it as his legal opinion that the complainant here was entitled to compound interest under the custom of London, under this agreement, and he says with reference to it: "I think that a question which arises on an agreement of this kind is a question of argument. I do not think it is for me to express an opinion as to what is the effect of this agreement.  That you have to argue out in Porto Rico."  And later he said, but for this agreement, he "would not hesitate to say that compound interest could be charged."  And later states: "The matter of doubt arises, if at all, from the fact that this agreement does not expressly state that compound interest should be charged."  This wit-

ness was, we think, the most competent of any either to testify in regard to, or give an opinion upon this subject.

Compound interest in and of itself is abhorrent to a chancellor. We do not mean by this statement to in any manner change the well-known rule that equity follows the law, nor do we mean to intimate that we would not decree such interest in favor of complainant, were it undoubtedly the law that they are entitled to it, but we feel that the rule with reference to compound interest is always that the claimant of it has the burden put upon him to show without any doubt whatsoever, his unquestioned right to it. We do not believe that it is contemplated in the contract, but, on the contrary, we think that a fair construction of the contract of 1883, because of its own terms and other conditions, excludes the idea of compound interest. We do not think that the complainant here has shown its unquestioned right to it, and therefore it will not be allowed in any accounting between the parties. We will cite the law more specifically on this interesting question later in this opinion. Neither do we concede the claim of the complainant that interest on the Hoard and Latimer claims in schedule two should begin in 1879, but, on the contrary, we hold that it is manifest that the compromise which fixed those claims at those figures and all agreements relating thereto merged in the contract of 1883.

## The Law of the Case.

Under the view the court takes of the rights of the parties here, it does not deem it of importance to decide what the nationality of the contract of 1883 is. An examination of the question satisfies the court that there is no material difference between English law, American law, and the civil law with

New Colonial Co. v. Canovanas Sugar Factory.

reference to what it requires to constitute a trust relation between parties, nor with reference to the duties which a trustee owes to his *cestui que trust.*

Neither is there any dispute between the opposing counsel in this case as to what the duties are which a trustee owes to his principal. The effort on behalf of complainant here is to show that the contract of 1883 does not constitute the relation of trustee between the English company and the Porto Ricans, and their further effort is in contending that even though the relation of trustee can be said to exist, as to the contract generally, that still there is nothing in or about the purchase of the Lanman & Kemp mortgage by the English company to render it in any sense whatsoever improper. On this latter point, they respectfully but emphatically insist that they are right.

For the sake of information of the reader of this opinion, to support the general rule, we refer him to: 1 Bispham, Eq. ¶ 92, pp. 152, 153; 1 Perry, Tr. pp. 300, 305, §§ 206, 209, 427, 428; 2 Pom. Eq. Jur. §§ 958, 959, 1075 and note; King v. Cushman, 41 Ill. 31, 89 Am. Dec. 366; Harrison v. Mock, 16 Ala. 616; Fiske v. Brunette, 30 Wis. 102; 27 Am. & Eng. Enc. Law, pp. 177, 198, 207 and many cases there cited.

If a trustee purchases claims against the trust estate at a discount, the court will not permit him to derive a personal profit out of the transaction. A profit inures to the benefit of the estate. He may demand, however, that he be reimbursed the amount of his expenditure in making purchases, with interest. Baugh v. Walker, 77 Va. 99; Fulton v. Whitney, 5 Hun, 16; Slade v. Van Vechten, 11 Paige, 27; Roberts v. Moseley, 64 Mo. 507; M'Clanahan v. Henderson, 2 A. K. Marsh. 388, 12 Am. Dec. 412.

New Colonial Co. v. Canovanas Sugar Factory.

It is even held that the same rules with reference to dealing with a trust property refer to an agent. Tiffany on Agency at p. 420, states the rule as follows: "So an agent employed to buy or to settle a claim will not be permitted, if he buys it in his own name, to hold it adversely to his principal, or to recover from him more than he actually paid." And at p. 422, the same author says: "Good faith demands that an agent shall not, without the knowledge and consent of the principal, make any profit out of the agency, beyond his stipulated compensation, or a reasonable compensation where none is fixed. All profits belong to the principal. . . . He must account for any commission, discount, or personal benefit received from a third person."

To appreciate the extent to which this agency rule is carried by courts of equity, one has but to read the decision in Kimball v. Ranney, 122 Mich. 160, 46 L.R.A. 403, 80 Am. St. Rep. 548, 80 N. W. 992. That was a case where the agent notified his principal of his intended purchase, and still his act was held to be for the benefit of the principal.

Story, in his work on Equity Jurisprudence, vol. 2, § 1211, states the doctrine succinctly. It is too long to quote, but, omitting other portions, he uses this language: "Thus, for example, if a trustee should purchase a lien or mortgage on the trust estate at a discount, he would not be allowed to avail himself of the difference; but the purchase would be held a trust for the benefit of the *cestui que trust.*" And on further, states: "The same principle will apply to persons standing in other fiduciary relations to each other. Thus, for example, if an agent who is employed to purchase for another purchases in his own name or for his own account, he will be held to be a trustee of the principal at the option of another. So if he is employed

to purchase up a debt of his principal and he does so at an undervalue or discount, the principal will be entitled to the benefit thereof, in the nature of a trust."

The same author, vol. 1, § 322, lays down the doctrine that it does not matter whether the trustee or agent makes any profit out of the transaction or not. That this would not be putting the doctrine upon its true ground, which is, that the prohibition arises from the subsisting relation of the trusteeship. See Story on Agency, § 211, p. 244, and from pages 248 to 252.

In the case of Michoud v. Girod, 4 How. 554, 11 L. ed. 1099, it is demonstrated that this same principle applies in the civil law. "In Spain the rule was enforced without relaxation." That is, the rule that the trustee or the agent, when he stands in a fiduciary relation, cannot speculate with or purchase claims against the estate for his own benefit. It may be said that the rule is of universal application. Counsel in their briefs cite so many authorities which uniformly uphold this rule that it would tire the court to cite even a small fraction of them.

Counsel for complainant in the later days of the argument laid particular stress upon the right of his client to refuse to render any accounting to the respondents save, if at all, only up to the date of filing the suit to foreclose the mortgage, on the 28th of September, 1901. And claiming further, that his clients have, ever since the purchase of the mortgage, or certainly since the filing of the suit, been mortgagees in possession under condition broken. The court thinks the fact as to possession is against him; and, on the other point, as to complainant being entitled to the rents and profits of the premises after the date of filing the suit, we think the law is against

New Colonial Co. v. Canovanas Sugar Factory.

him, both in England and America. The doctrine of Moss v. Gallimore, 1 Dougl. K. B. 279, decided by Lord Mansfield, was not a case like the one at bar, and in fact, Lord Mansfield himself in a later case, Chinnery v. Blackman, 3 Dougl. K. B. 391, held that the doctrine of Moss v. Gallimore does not apply against a mortgagor or the vendee of his equity of redemption, and that until the mortgagee takes possession, the mortgagor is entitled to all the profits made.

The Colonial Company, Limited, never, in any manner, as the court believes, changed the character of its possession from the day it took the property, in 1883, to the present time. The Supreme Court of the United States in Teal v. Walker, 111 U. S. 242, 28 L. ed. 415, 4 Sup. Ct. Rep. 420, announces that it is the doctrine of the American courts of equity that a mortgage is a mere security for a debt, and establishes absolutely the rule that the mortgagee is not entitled to the rents and profits until he gets possession under a decree of foreclosure. This decision is binding upon this court.

Finally, it is admitted that no matter what the doctrine with reference to the relations between trustees and their principals that might prevail in the state courts of the United States is,—and it is admitted that in one or two of them, as in Texas, by statute a trustee is not prevented from buying an outstanding claim against the trust property if he is in no manner connected with it,—still, if the doctrine of the Supreme Court of the United States in this sort of a case would permit this action of the complainant here, this court would be bound by it. Complainant's counsel cites four cases from the Supreme Court of the United States with great confidence that this is the rule. The first of them is the case of Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. ed. 328, holding that a director of a cor-

poration is not prohibited from lending it money when the money is needed and the transaction is open and free from blame, nor from buying the property on a sale for that loan. We have examined that case and find the facts in it entirely different from those here. The director who loaned the money was certainly free from blame, and the foreclosure was made by an outside independent trustee, and the other stockholders and corporation that objected to the matter were guilty of great laches and waited with knowledge of the facts until the director had, by his own money, immensely increased the value of the oil wells in question.

The second of them is the case of New Orleans Nat. Bkg. Asso. v. Le Breton, 120 U. S. 765, 30 L. ed. 821, 7 Sup. Ct. Rep. 772. We have examined that case with care, and the justice of the holding of the court is manifest, that the party mentioned was not a trustee in an equitable sense, and that, anyway, the attacking party was guilty of such laches as to bar relief. The court held that the parties occupied only the position of vendors legally responsible for any surplus in their hands, for which they were liable if they did not pay it over; and further says: "This is a very different position from that of a trustee in the chancery sense of the term." It was not a case like the one at bar, where the trustee has the sole and exclusive possession and control of the scheduled property in the very broadest sense of the terms, and where the beneficial owners are excluded absolutely from any voice in connection either with the property, the business, its management or operation, and the term not yet ended, and no transfer of the property made.

The third of them is the case of Allen v. Gillette, 127 U. S. 589, 32 L. ed. 271, 8 Sup. Ct. Rep. 1331. That case was an appeal from the state of Texas, where the rule is that a trustee

New Colonial Co. v. Canovanas Sugar Factory.

may purchase interests in the property concerned, at a sale that is brought about without his intervention. But in that particular case the court held that the indebtedness and the property involved had no real relationship with the trusteeship which he was occupying. We submit the case in proof of this statement of it.

The fourth case is the celebrated case of Hammond v. Hopkins, 143 U. S. 224, 36 L. ed. 134, 12 Sup. Ct. Rep. 418, which, about fifteen years ago, was a subject much talked of in the city of Washington, and threatened to dislocate the titles to a large section of the city. It was one of the very few cases decided by the Supreme Court of the United States, where, were such a thing possible, that august tribunal would have been liable to embarrassment by the proximity of their own very neighbors, whose rights they were passing upon. The present Chief Justice, Mr. Fuller, delivered the opinion of the court, and it is indeed a most learned historical essay upon the rules of law governing trusteeships, and indulges in a considerable detail of the evidence from the immense record in the cause. It was an effort to set aside a sale that had stood for many years after foreclosure, for fraud; not a case such as this is, where the foreclosure has not yet taken place and where, at the time this suit was filed, the actual trust between the parties had not come to an end. The closing paragraph of the great Chief Justice's opinion gives the reason for the decision there: "In all cases where actual fraud is not made out, but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence. The hour-glass must supply the ravages

New Colonial Co. v. Canovanas Sugar Factory.

of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused."

As to the matter of compound interest, counsel for complainant insist in their argument, that there was no law in Porto Rico at the time of the execution of the contract of 1883 which prohibited the payment of compound interest or its collection. For the reasons before stated, we do not think it is necessary to decide that question, but counsel for respondents dispute the fact and say that there was a law passed in Spain, on March 14, 1856, which, on July 21st of the same year, was extended to Porto Rico, and was in force here in 1883 and thereafter, and is found in vol. 6, p. 559 of the Diccionario de Administración, etc. Art. 7 of this law provided that during the existence of the contract, interest due and not paid cannot bear interest, etc. But that after it was due, by special contract it might be added to the principal. However, as we stated, the burden is upon the complainant to show its right to compound interest, and we do not think they have established that right.

Some mention during the argument was made of what is known in the civil law as the law of antichresis. We do not think it is material to examine into this question, and we mention it at all only for the purpose of calling attention to the fact that, under this law, from time immemorial, Spaniards gave up estates to their creditors in lieu of interest, holding the equity of redemption to themselves until it had paid out through rents and profits, or until they had satisfied their creditor from other sources while he thus held the property. Attention is called to it only in emphasis of the contention of these respondents that their ancestors, when giving up their es-

tates to the English company, had no thought but that they would some time be redeemed, and that this was the reason they made the long twenty-year trust contract.

The authorities here cited will, when examined, convince any legal mind that the rule is as contended for here. We submit, therefore, that the facts in this case and the views here expressed fully justify the following:

Findings of Law and Fact Which the Court Hereby Makes.

1. That the parties are all properly and regularly before the court, and that it has full power and jurisdiction to settle their respective rights in the premises.

2. That the contract of 1883 created a legal and express trust with The Canovanas Sugar Factory, Limited, as *cestui que trust,* and the Colonial Company, Limited, as trustee.

3. That the respondent Latimer, Hoard, and Fernandez heirs are the owners of the equity of redemption of three fourths of the capital stock of The Canovanas Sugar Factory, Limited, now in the possession of the New Colonial Company, Limited, under pledge, which was issued to the ancestors of said respondents under § 5 of the contract of 1883, and are entitled to have the same returned to them at the proper time, when the object of the pledge has been accomplished, in accordance with said contract and the views herein expressed.

4. That the New Colonial Company, Limited, is the due and legal successor of the Colonial Company, Limited, and of its rights, powers, and privileges.

5. That the New Colonial Company, Limited, is the owner in its own right, by due and legal purchase, of all of the shares of the capital stock of The Canovanas Sugar Factory, Limited,

New Colonial Co. v. Canovanas Sugar Factory.

issued under § 5 of the contract of 1883, to Wenceslao Borda, to wit, shares numbered from 7495 to 9992, inclusive.

6. That the New Colonial Company, Limited, is the due and legal owner by purchase and assignment, of the Lanman & Kemp mortgage, but that, under its trust, the contract of 1883, and as matter of law, it is not entitled to collect the same against the trust property for a greater amount than the sum, including the interest thereon, which it paid for the same at the date of the final purchase thereof, when the assignment was made, together with interest at 6 per cent per anuum upon that sum from the date of such assignment to the date it has been, if such is the fact, or shall be, extinguished by payments on it as provided in the contract of 1883, the interest being reduced *pro rata* by the credits as the time elapsed, as shall hereafter appear by the accounting.

7. That, as matter of fact and law, the Colonial Company, Limited, or the New Colonial Company, Limited, never had or possessed the right to foreclose the said Lanman & Kemp mortgage, because of their fiduciary relation to the mortgagor and parties in interest, and the manner in which the same was purchased, and that, if it ever had such right, the same was in fact and in law waived by the contract of December 4, 1902, specifically extending the life of the contract of 1883 for five years, until 1908, and from year to year thereafter until all the debts and equities between the parties have been fully settled, and because it was not certain at the filing of the suit, and is not certain yet, but that the same has already been paid.

8. That the only items of schedule two of the contract of 1883, in which the New Colonial Company, Limited, is now interested, are the first, for £7,906 1s. 4d.; the fourth, being the sum of 114,582 pesos; and the fifth, being the sum of 192,-

New Colonial Co. v. Canovanas Sugar Factory.

583 pesos. And that if anything remains to be done as to the other items in the said schedule mentioned, the court reserves the authority to make such orders in relation thereto at any future time as may be proper herein.

9. That as to the items in the last finding mentioned, concerning the said New Colonial Company, Limited, it is entitled to recover the same, together with 6 per cent per annum simple interest on the value, whether pound or pesos, thereof from the date of said contract of 1883, as the same may have been reduced from time to time by payments, if any, thereon under the said contract of 1883, to the date of extinguishment that may or ought to have been made thereof.

10. That an accounting must be had between the complainant and the respondents from the very beginning of business under the contract of 1883, but that said accounting shall not disturb any yearly statements that may have been made by the complainant or its predecessor, save for fraud, manifest error, or gross overcharge, and save for the purpose of extracting and discarding from the same any compound interest that may have been charged, and carrying the account forward with simple interest at 6 per cent per annum, less any credits under the contract or otherwise that may or ought to have been made against the same.

11. That the complainant shall be entitled to recover all that may be due it for any special outlay it may have made in the premises under the contract of 1883, and not yet repaid under the same or otherwise, but with simple interest only thereon at the rate of 6 per cent per annum.

12. That said accounting shall be brought down to the date the master, who shall be appointed to make the same, makes his report, and that the same shall not stop at the date of the

filing of the suit herein, in A. D. 1901, and shall embrace all receipts, expenditures, and charges properly cognizable in the premises, and he shall ascertain the value of the peso under the contract.

13. That the complainant shall be and is entitled to a continuing lien upon the stock of The Canovanas Sugar Factory, Limited, belonging to these respondents, still in its possession under pledge, until the equities have been settled as herein contemplated.

14. That the respondents herein, including the corporation respondent, were not obliged at any time when pleading in these proceedings, to tender into court the amount of money alleged to have been paid by the complainant for the purchase of the Lanman & Kemp mortgage, because it was then uncertain, and still is, whether or not there is in fact anything due thereon, and not certain but that the same has been nearly or fully paid off and canceled.

15. That the New Colonial Company, Limited, is still in possession of the estates of the Canovanas Sugar Factory, Limited, as trustee, under the extension of the contract of 1883, the same as in the first instance, and that its possession has never in any manner changed in the premises, and that it is not in possession as a mortgagee under condition broken.

16. That there is nothing in the contract of 1883 that permits other than simple interest at the rate of 6 per cent per annum to be charged on balances or debts between the parties herein, or in the law or the facts applicable in the premises.

17. That there is enough evidence in the case already, consisting of the written testimony and the exhibits, that, together with such proofs as the local manager of the Canovanas sugar plantation here in Porto Rico can present, will enable the mas-

New Colonial Co. v. Canovanas Sugar Factory.

ter the court shall appoint to make this accounting to complete the same here in Porto Rico, and that the same shall be done without delay, and under the direct supervision of the court; the court reserving the cause for all purposes with a view to making further orders herein when the said accounting is had and the report made, or during the progress thereof.

18. That the court regards the sugar factory and plantation as a going concern in the custody of the New Colonial Company, Limited, under the extended contract of 1883, and such management and possession as heretofore is not to be disturbed, as for the present it is thoroughly satisfactory to the court, until after the accounting herein to be had, and the further order of the court in the premises.

19. The court reserves the matter of the costs in this cause until final decree, save that each party must pay its own costs as it proceeds, to the officers of this court, including the examiner or referee who shall be appointed to take the accounting hereby ordered.

20. That this opinion and the findings of fact in the same, save as to the main features thereof, is interlocutory and tentative, and the court reserves the right at any time before final decree to make any minor corrections or changes in the same that may be shown to be proper, consistent with its general tenor. And further, the court reserves the right, after the accounting, to dispose of the entire matter in such way as may be deemed proper, depending on how the balances may appear under the accounting, how the parties themselves may agree or deal with each other, and how nearly the equities between the parties may have balanced accounts, or the contrary, and the effect a further continuance or cessation of the trust might have in that behalf. And an interlocutory

New Colonial Co. v. Canovanas Sugar Factory.

decree embodying the points of fact and law decided herein, together with the orders herein made, will be prepared and entered of record.

# CANOVANAS SUGAR FACTORY, LIMITED.

---

An agreement made this third day of February, 1883, Between Don José Ramón Fernández Marqués de la Esperanza (hereinafter called the Marqués de la Esperanza), of San Juan, in Porto Rico, in the West Indies, of the first part; Charles Alexander Hoard, of the same place, merchant, of the second part; William Henry Latimer, of the same place, merchant, of the third part; Wenceslao Borda, of the same place, merchant, of the fourth part; the said Marqués de la Esperanza, Charles Alexander Hoard, and William Henry Latimer, as the representatives of George Latimer, deceased, of the fifth part; the said William Henry Latimer, as liquidator of the estate and affairs of the firm of Latimer & Company lately trading at San Juan aforesaid, of the sixth part; La Sucesión de Don Jorge Latimer y Compañía, of San Juan aforesaid (the said succession being a firm composed of the several persons parties hereto of the first four parts), of the seventh part; Edward Kemp and Adolph Hallgarten (general partners) and George Kemp (special partner), all of the city of New York, merchants and copartners, trading as (and hereinafter called) Lanman & Kemp, of the eighth part; the said Edward Kemp of the ninth part; and the Colonial Company Limited, of 16, Leadenhall street, in the city of London, of the tenth part:

Whereas the estates of Punta and San Isidro, in the island of Porto Rico, with the Central Sugar Factory of Canóvanas erected thereon, and the lands, buildings, railways, machinery, and plant belonging thereto, and shortly described in the first schedule hereto (and hereinafter called collectively "the scheduled property"), are now as all the parties hereto hereby respectively admit, as to part conveyed to the said Edward Kemp, and as to the whole or the remaining part mortgaged and charged to or in favor of Lanman & Kemp, for securing certain moneys due and owing to the said Edward Kemp and Lanman & Kemp; and whereas the aggregate amount of the claims of Lanman & Kemp and the said Edward Kemp against the scheduled property, as made up to the 30th day of September, 1882, amount (as all the parties hereto hereby admit) to the sum of £68,308 (hereinafter called "Lanman & Kemp's debt"), bearing interest at the rate of £6 per cent per annum from the said 30th day of September, 1882: and whereas it is alleged by the parties hereto or some of them other

New Colonial Co. v. Canovanas Sugar Factory.

than the said Edward Kemp and Lanman & Kemp, that the scheduled property or some part thereof is (subject to Lanman & Kemp's first claim thereon for their debt) liable for the payment of the various amounts specified in the second schedule hereto; and whereas it has been proposed with a view to the efficient working of the scheduled property that the same should be worked by a company to be formed with limited liability in manner hereinafter mentioned, and all the parties hereto have acquiesced therein, and for the purpose of carrying out and giving effect to the proposed arrangement have consented to enter into this present agreement: Now these presents witness that it is hereby agreed by and between all the parties hereto as follows:—

1. The Colonial Company Limited shall and will, within three months after the date of these presents, cause to be duly incorporated and registered in England under the Companies' Acts, 1862 to 1880, a company (hereinafter called "the projected company") by the name of "The Canovanas Sugar Factory Limited," or such other name (if any) as may be agreed on in that behalf between the parties hereto of the 8th and 10th parts, with liability limited by shares, and with a nominal capital of £200,000, divided into 10,000 shares of £20 each, to be treated as fully paid up, notwithstanding there shall not be any sum paid in cash upon or in respect of any of the said shares. The principal objects of the projected company shall be, in effect, the acquiring and working of the scheduled property, and the carrying on of the business connected therewith, with such other objects (if any) as may be agreed upon in that behalf between the parties hereto of the 8th and 10th parts, and the memorandum and articles of association of the projected company shall be in such form as the parties hereto of the 8th part shall approve.

2. The expenses to be incurred in or about the formation and registration of the projected company shall be defrayed by the Colonial Company Limited, who shall be entitled to be reimbursed in respect thereof as part of the sum of £15,000 for special outlay, hereinafter mentioned, and not otherwise.

3. The parties hereto hereby respectively agree that they respectively will, according to their respective rights and interests to and in the scheduled property, execute and do all such deeds, instruments, and things as may be necessary according to the laws of Porto Rico for absolutely and indefeasibly (subject as hereinafter mentioned) vesting in the projected company as purchaser as from the 30th day of September, 1882, upon the terms hereinafter appearing, their respective rights and interests to and in the scheduled property freed and discharged from all claims by or on behalf of any of the parties hereto. As from the said 30th day of September, 1882, the scheduled property and the business thereof shall be deemed to have been carried on for and on behalf of the projected company, and all outlay of Lanman & Kemp in respect thereof subsequent

New Colonial Co. v. Canovanas Sugar Factory.

to that date, and all costs and expenses incurred by them in connection with the business and this agreement, and the carrying out of the same since that date, shall be paid to them by the Colonial Company Limited and charged by them as part of the working expenses of the projected company for the current year.

4. In consideration of Lanman & Kemp and the said Edward Kemp joining in the said vesting in the projected company of the scheduled property, the projected company shall immediately upon such vesting being effectuated execute and do all such instruments and things as may be necessary according to the laws of the said island of Porto Rico, for validly and effectually mortgaging the scheduled property to and vesting the same in Lanman & Kemp as first mortgagees thereof for the amount, and to secure the due payment of Lanman & Kemp's debt with interest thereon (payable half-yearly) from the said 30th day of September, 1882, at the rate of 6 per cent per annum, and with all such powers, rights, and remedies for recovering and enforcing (subject as hereinafter provided) the payment of Lanman & Kemp's debt and the said interest thereon as are by the laws, practices, or usages of the said island incidental to or usually inserted in first mortgages of such property, or as Lanman & Kemp shall, consistently with those laws, require. The said mortgage (hereinafter called "Lanman & Kemp's mortgage") shall be duly registered, as by the laws of Porto Rico and English law respectively may be required, or as may be by Lanman & Kemp deemed necessary or expedient for ensuring the validity thereof, and the projected company shall thereby enter into an absolute and unconditional covenant with Lanman & Kemp to pay to them on the 30th day of September, 1883, Lanman & Kemp's debt, and interest thereon at the rate aforesaid from the 30th day of September, 1882, up to the said 30th day of September, 1883.

5. In consideration of the parties hereto, other than Lanman & Kemp, joining in the said vesting in the projected company of the scheduled property, the projected company shall issue to each of the parties hereto of the 1st, 2nd, 3rd, and 4th parts 2,498 fully paid-up shares of £20 each in the original capital of the projected company, and the shares so to be issued to the Marqués de It Esperanza shall be numbered from 1 to 2,498 inclusive, and the shares so to be issued to the said Charles Alexander Hoard shall be numbered from 2,499 to 4,996 inclusive, and the shares so to be issued to the said William Henry Latimer shall be numbered from 4,997 to 7,494 inclusive, and the shares so to be issued to the said Wenceslao Borda shall be numbered from 7,495 to 9,992 inclusive, and the said shares so to be issued to the parties hereto of the 1st, 2nd, and 3rd parts respectively shall immediately after the issue thereof be transferred to the Colonial Company Limited, or their nominees, for the purposes hereinafter mentioned in that behalf. The remaining shares, which shall be numbered from 9,993 to

New Colonial Co. v. Canovanas Sugar Factory.

10,000 inclusive, shall be issued by the projected company as fully paid-up shares to persons to be nominated by the Colonial Company Limited.

6. The Colonial Company Limited shall be at liberty from time to time, within five years from the date hereof, out of their own moneys, to expend, including the expenses to be incurred in or about the formation and registration of the projected company, and the commission payable to the Colonial Company Limited in respect of so much of the sum next hereinafter mentioned as shall be expended by them, a sum or sums not exceeding £15,000 in the whole (hereinafter called "the special outlay") in supplying to and setting up at the said factory such extra or new machinery, erections, and appliances, and effecting such alterations and improvements of the existing machinery, buildings, and appliances there, as shall, in their judgment, be requisite for enabling the said factory to be worked to the best advantage. The Colonial Company Limited shall not, as between themselves on the one hand, and Lanman & Kemp and persons claiming under them on the other hand, have or seek to assert, either in the said island of Porto Rico or elsewhere, any charge, lien, right, or claim whatsoever upon, to, or against the scheduled property or any part thereof, or (except as hereinafter provided), upon, to, or against the produce of the said estates, or of the said factory, or any property whatsoever of the projected company in respect or in consequence of the special outlay, and so long as they shall have the management of the said estates, factory, and business, under the provisions in that behalf hereinafter contained, they shall not be entitled to receive and shall not require repayment of the special outlay or any part thereof, or any interest thereon, otherwise than under and in accordance with the provisions in that behalf contained in clauses 14, 16, and 17, of this agreement.

7. Subject and without prejudice to the rights, remedies, and position of Lanman & Kemp as such mortgagees as aforesaid, and generally to the provisions in their favor herein contained and stipulated for, the Colonial Company Limited shall as from the date hereof, during the term of 20 years, or such shorter period as may suffice for the liquidation of Lanman & Kemp's debt, and the said interest thereon, and also of the other debts specified in the 2d schedule hereto, have and undertake the entire and exclusive management and control on behalf, and as the agents or managers of the projected company of the scheduled property and of the business carried on thereon, and therewith and for that purpose shall have the amplest powers of engaging, remunerating, and dismissing agents, servants, workmen, and laborers, and of repairing and renewing buildings, machinery, and plant of every description, and of entering into and carrying out all such contracts as they may think proper, for the supply of canes or other materials of any description, and of cultivating the said estates, and of procuring such machinery, plant, stores, and materials as they may

New Colonial Co. v. Canovanas Sugar Factory.

think necessary, and of selling, dealing with, and disposing of the produce of the said estates and factory as well in the said island as elsewhere, and generally of executing and doing all acts, matters, and things in relation to the scheduled property and the said business and the management and control thereof respectively as the Colonial Company Limited shall think . fit, and (subject and without prejudice aforesaid) the Colonial Company Limited shall, during the aforesaid term of 20 years, or such shorter period as aforesaid, be, and be considered as, the consignees of the said estates.

8. The Colonial Company Limited shall, from time to time, throughout the said term or period, provide, as and by way of advance to the projected company, the necessary funds and working capital as usual with consignees in such cases, for carrying on the business of the said factory, as also the amount necessary for the maintenance and carrying on of the scheduled property and the said business during the wet or inactive season, but such last-mentioned amount is not to exceed in any one season (unless with the consent of Lanman & Kemp so long as any part of Lanman & Kemp's debt or any interest thereon or on any part thereof shall remain unpaid, nor at any time unless at the option of the Colonial Company Limited), the sum of £5,000: Provided nevertheless, that this limit of £5,000 shall apply to expenditure during the wet or inactive season, exclusive of any advances which the Colonial Company Limited may think fit to make, and which they are hereby authorized to make, for or in respect of the cultivation of canes on any part of the said estates. The moneys constituting every advance made by the Colonial Company Limited in pursuance of this clause, shall carry interest at the rate of 6 per cent per annum from the date of the advance thereof respectively up to the date of repayment, and the same moneys and the interest thereon shall be regarded as part of the working expenses of the said estates, factory, and business, and be repaid or retained accordingly to or by the Colonial Company Limited out of the first available gross proceeds of the produce of the said estates and factory.

9. If in any year during the said term of 20 years, or such shorter period, as aforesaid, it shall be necessary that advances should, during the wet or inactive season, be made for the purposes in that behalf indicated in the last preceding clause hereof, to an amount exceeding the sum of £5,000 in the whole (exclusive of any advances made for or in respect of the cultivation of canes) and the Colonial Company Limited shall not be willing to make advances beyond that sum, and the projected company shall not provide the extra sum required, or if at any time the uncovered advances of the Colonial Company Limited, under the last preceding clause hereof, after giving credit for the estimated value of the produce of the year or years in respect of which the advances shall have been made, shall exceed the sum of £5,000, the Colonial Company Limited

New Colonial Co. v. Canovanas Sugar Factory.

shall be at liberty to determine such of the provisions of this agreement or of any corresponding agreement which may in pursuance hereof be entered into between them and the projected company, as relate, or shall relate, to the management and control by the Colonial Company Limited of the scheduled property and the said business, and the making of such advances by them as are mentioned in the 8th clause hereof, and thereupon Lanman & Kemp shall be at liberty forthwith to enter upon and take possession of the scheduled property, and exercise all their powers of foreclosure, sale, or otherwise, as mortgagees in repect thereof, anything herein contained to the contrary notwithstanding.

10. The remuneration to be received by the Colonial Company Limited in respect of their said management shall be a commission of 4 per cent on the gross proceeds of all produce of the said estates and factory, and a commission of 2½ per cent on the invoice value of all machinery, stores, and materials of any description, purchased and shipped by them for use on, or in connection with, the said estates or factory, or in relation to the said business.

11. The Colonial Company Limited shall, so long as they shall continue the management of the said estates, factory, and business, keep the said factory, with all the buildings, machinery, plant, produce, and other effects, in, upon, or about the same, insured against loss or damage by fire, in or for a sum or sums not being more than £30,000 and not being less than £25,000, or in or for such other sum or sums (if any) as may be agreed upon between the Colonial Company Limited and Lanman & Kemp, and the expense of such insurance shall be part of the working expenses of the business, to be repaid to them out of the gross proceeds of the produce of the said estates and factory. So long as Lanman & Kemp's debt, or any part thereof, shall remain owing, and they shall so require, the said insurances shall be effected in Lanman & Kemp's name, so as to entitle them to receive the moneys thereby insured, and in the event of the total destruction of the said factory by fire at any time at which two thirds at least of Lanman & Kemp's debt remains owing, Lanman & Kemp shall have the option either to apply the moneys so received in or towards discharge of so much of Lanman & Kemp's debt as shall them remain owing, or to permit the same or any part thereof to be applied in rebuilding or reinstating the said factory; in the event of less than two thirds of Lanman & Kemp's debt being then owing, such insurance moneys shall be applied in rebuilding or reinstating the said factory, unless Lanman & Kemp and the Colonial Company Limited shall otherwise agree. The Colonial Company Limited shall also, so long as they shall continue the management of the said estates, factory, and business, duly insure all produce consigned to them from, and goods shipped by them to, the said estates and factory, against marine risk and loss or damage by fire, charging the expense thereof against the gross proceeds of the produce so insured.

New Colonial Co. v. Canovanas Sugar Factory.

12. The Colonial Company Limited shall, so long as they shall continue the management of the said estates, factory, and business, keep in the name of the projected company a separate banking account in respect of all funds of the projected company, passing through the hands of the Colonial Company Limited, as also all proper and separate books of account (which books of account shall be the property of the projected company) in respect of the business thereof, and shall render yearly accounts current thereof to Lanman & Kemp, so long as Lanman & Kemp's debt or any part thereof, or any interest in respect thereof, shall be unpaid or owing.

13. The net profits arising from the cultivation and working of the said estates, factory, and business under this agreement (the expression "net profits" herein meaning the amount remaining after payment out of the gross proceeds of the produce of the said estates and factory, of all working expenses and necessary outgoings, and the commissions mentioned in the 10th clause hereof, but not the commission upon the special outlay contemplated by the 6th clause hereof, which commission is to be treated as part of the special outlay), shall be applicable and shall from time to time, so far as the same will extend, be applied in the manner and order hereinafter mentioned in that behalf.

14. On the 30th day of September, 1883, there shall, out of the net profits made up to that day, in the first place, be paid to Lanman & Kemp interest at the rate aforesaid, from the 30th day of September, 1882, to the said 30th day of September, 1883, on the said principal money to be secured by Lanman & Kemp's mortgage, and then £4,000 in reduction of the same principal money, and, in the next place, be paid to the Colonial Company Limited, interest at the same rate upon so much of the special outlay as shall then have been actually made (such interest to be computed on each item of the special outlay from the date of outlay up to the said 30th day of September, 1883). The residue (if any) of the same net profits shall be applied, first, in repayment to the Colonial Company Limited of such part of the principal of the special outlay as shall have been expended in new boilers and furnaces for the said factory, and in the formation and registration of the projected company, and subject thereto, shall be applied in or towards payment to Lanman & Kemp of the moneys owing on the security of their mortgage.

15. In every year, commencing from the 1st day of October, 1883, there shall, until all moneys to be secured by Lanman & Kemp's mortgage shall have been paid in full, be paid to Lanman & Kemp out of the net profits, in priority to every other payment thereout, a year's interest at the rate aforesaid, on the principal money for the time being remaining owing upon the security of Lanman & Kemp's mortgage, and then £4,000 in reduction of the same principal money, such interest to be paid half-yearly, on every 31st day of March and 30th day of September, and such £4,000 to be paid on every 30th day of September.

New Colonial Co. v. Canovanas Sugar Factory.

16. In every year, commencing from the 1st day of October, 1883, if any portion of the said special outlay shall then be owing to the Colonial Company Limited, there shall, next after the payments of interest and in reduction of principal mentioned in clause 15 hereof, be paid out of the net profits (so far as the same will extend) to the Colonial Company Limited, interest at the rate aforesaid upon so much of the special outlay as shall for the time being be owing, and the residue (if any) of the net profits, or so much thereof as shall be required for the purpose, shall be paid to the Colonial Company Limited in or towards repayment of the principal of the said special outlay.

17. Subject to the repayment in full to the Colonial Company Limited of the special outlay with the said interest thereon, there shall in every year, out of the residue (if any) of the net profits remaining, after making out of the net profits the payments of interest, and in reduction of principal mentioned in clause 15 hereof, be paid pari passu to the said Charles Alexander Hoard, an annuity of £400, and to the said William Henry Latimer an annuity of £200 (each of the said annuities to be payable only during the life of the annuitant or until he shall become entitled to the retransfer of his shares hereinafter provided for, and to be payable by quarterly instalments, whereof the first is to be payable on the 31st day of December, 1883), and subject thereto the said residue (if any) shall, notwithstanding that in any previous year or years the said annuities or either of them may not have been paid in full, or at all, be applied on every 30th day of September, in or towards payment to Lanman & Kemp of the moneys for the time being remaining owing on the security of Lanman & Kemp's mortgage, until all moneys secured by Lanman and Kemp's mortgage shall have been paid (interest being always paid before principal) in full. Provided always, that it shall in any year be lawful for the Colonial Company Limited to pay the said annuities, or either of them, next after the payments of interest, and in reduction of principal mentioned in clause 15 hereof, and in priority to any payment for special outlay, and then to apply the residue of the said net profits in repayment of the special outlay.

18. If, and so long as the Colonial Company Limited shall continue the management of the said business, and duly find and provide all the funds requisite for carrying on the same pursuant to clause 8 hereof, and all the other terms of this agreement shall be observed and performed by the parties hereto, other than Lanman and Kemp and the said Edward Kemp, so far as the same are to be observed and performed by such other parties respectively, and all the terms of Lanman and Kemp's mortgage (except the said covenant to be therein contained for the payment by the projected company of the whole of the principal of Lanman and Kemp's debt on the 30th day of September, 1883) shall be observed and

New Colonial Co. v. Canovanas Sugar Factory.

performed by the projected company, and interest at the rate aforesaid on the whole of the principal money to be secured by Lanman and Kemp's mortgage from the 30th day of September, 1882 to the 30th day of September, 1883, shall be paid to Lanman and Kemp on the 30th day of September, 1883, or within 28 days next thereafter, and a half year's interest at the same rate on so much of the same principal money as shall, for the time being, remain unpaid, shall be paid to Lanman and Kemp on the 31st day of March, 1884, or within 28 days next thereafter, and on every subsequent 30th day of September, and 31st day of March, or within 28 days next after each of the said days, and an instalment of at least £4,000 on account of the same principal money shall be paid to Lanman and Kemp on the 30th day of September, 1883, and on every subsequent 30th day of September, or within 28 days next after each of the said days, and the said net profits (if any) shall from time to time be applied (so far as the same will extend) strictly in the manner and order hereinbefore mentioned in that behalf, Lanman and Kemp shall not interfere with the management of the said estates, factory, or business, nor enforce any of their rights, powers, or remedies under Lanman and Kemp's mortgage; but if at any time the Colonial Company Limited shall, pursuant to the power reserved to them by clause 9 hereof, determine the aforesaid agreement on their part to continue the management of the said business, or fail to find and provide all the funds requisite for carrying on the same (notwithstanding Lanman & Kemp are prepared to consent thereto, to any extent to which under clause 8 their consent may be necessary), or if there shall be any default on the part of any of the parties hereto, other than Lanman & Kemp and the said Edward Kemp, in observing or performing any of the terms of this agreement, of if there shall be any default on the part of the projected company in observing or performing any of the terms of Lanman & Kemp's mortgage (except the projected company's covenant therein for payment of the whole of the principal of Lanman & Kemp's debt on the 30th day of September, 1883), or if interest at the rate aforesaid on the whole of the principal money to be secured by Lanman & Kemp's mortgage, from the 30th day of September, 1882, to the 30th day September, 1883, shall not be paid in full to Lanman & Kemp on the 30th day of September, 1883, or within 28 days next thereafter, or if a half-year's interest at the same rate on so much of the same principal money as shall for the time being remain unpaid shall not be paid in full to Lanman & Kemp on the 31st day of March, 1884, or on any subsequent 30th day of September or 31st day of March, or within 28 days next after each of the said days, or if on the 30th day of September, 1883, or on any subsequent 30th day of September, or within 28 days next after each of the said days, an instalment of at least £4,000 on account of the same principal money shall not be paid to Lanman & Kemp, or if at any time the said net profits (if any) shall not be applied strictly in the manner and

New Colonial Co. v. Canovanas Sugar Factory.

order hereinbefore mentioned in that behalf, then, and in any of the said cases, it shall be lawful for Lanman & Kemp, their executors, administrators, or assigns, forthwith or at any time thereafter to enforce all or any of their rights, powers, and remedies under Lanman & Kemp's mortgage, and in particular to enter into possession of and work the said estates and factory, or to take proceedings for the sale or foreclosure of the whole or any part or parts of the properties to be comprised in Lanman and Kemp's mortgage. Provided, nevertheless, that Lanman & Kemp shall not enforce any of their rights, powers, or remedies under Lanman & Kemp's mortgage, by reason only or on the ground only of the occurrence of any of the following events, that is to say—

(1.) Nonpayment to Lanman & Kemp on the 30th day of September, 1883, or within 28 days next thereafter, of a full sum of £4,000 on account of the principal money to be secured by Lanman and Kemp's mortgage, if such nonpayment be attributable to deficiency of the said net profits to meet the same, and if interest at the rate aforesaid on the whole amount of the same principal money from the 30th day of September, 1882, to the 30th day of September, 1883, be, on the last-mentioned day or within 28 days next thereafter, paid in full to Lanman and Kemp.

(II.) Nonpayment to Lanman & Kemp of a full sum of £4,000 on account of their said principal money on the 30th day of September, 1884, or on any subsequent 30th day of September, or within 28 days next after each of the said days not immediately preceded by more than one 30th day of September, on which a like nonpayment shall have occurred, if either the aggregate amount paid to Lanman & Kemp previously to such nonpayment, on account of their said principal money divided by the number of years, at the time of the same nonpayment elapsed since the 30th day of September, 1883, show an average yearly payment to Lanman & Kemp of not less than £4,000, on account of the said principal money, or if the Colonial Company Limited, or the projected company, within one calendar month after the same nonpayment, pay out of their own moneys to Lanman & Kemp the sum required to make up to them such an average yearly payment, and if all interest at the rate aforesaid on so much of the same principal money as shall from time to time remain unpaid shall have been always regularly and punctually paid to Lanman & Kemp on the days hereinbefore provided for the payment thereof respectively, or within 28 days next after each of the said days.

(III.) Nonpayment to Lanman & Kemp on any 30th day of September, or within 28 days next thereafter, while the special outlay, or any part thereof, or any interest in respect thereof, remains unpaid or owing to the Colonial Company Limited, of a full sum of £4,000 on account of the said principal money, if such nonpayment be attributable to general failure of crops in the said island or in the district of "Loisa," fire, tempest, flood, earthquake, or other exceptional cause or insuperable accident, and all interest at the

New Colonial Co. v. Canovanas Sugar Factory.

rate aforesaid on so much of the said principal money as shall from time to time remain owing shall have been always regularly and punctually paid to Lanman & Kemp on the days hereinbefore provided for the payment thereof respectively, or within 28 days next after each of the said days.

19. If the Colonial Company Limited pay any money to Lanman & Kemp for the purpose of satisfying any payment which has to be made hereunder, in order to prevent Lanman & Kemp from becoming entitled to enforce all or any of their rights, power, or remedies under Lanman & Kemp's mortgage, the scheduled property, and all other the property and effects for the time being of the projected company shall (subject only to Lanman & Kemp's mortgage) be charged with and be a security for the payment to the Colonial Company Limited of the money so paid by them and interest thereon after the rate of £6 per centum per annum, and the projected company shall at any time thereafter, at the request of the Colonial Company Limited, execute to them a valid and effectual second mortgage of the property and effects for the time being of the projected company or of such portion or portions thereof as the Colonial Company Limited shall select for securing to them the repayment of the money so paid by the Colonial Company Limited, with interest thereon at the rate aforesaid: Provided always that no security to be taken by the Colonial Company Limited under this clause shall in any way prejudice or affect the position, rights, powers, and remedies of Lanman & Kemp, either as to sale, foreclosure, or otherwise hereunder or under Lanman & Kemp's mortgage. Provided also that the Colonial Company Limited shall be entitled at any time, upon giving to Lanman & Kemp six calendar months previous notice in writing of the desire of the Colonial Company Limited to have an assignment of Lanman & Kemp's mortgage, to have, at the cost and expense in every respect of the Colonial Company Limited, at the expiration of the said six months, the said mortgage and the principal and interest moneys secured thereby, assigned to the Colonial Company Limited or its nominees, upon payment to Lanman & Kemp of the principal money then due and owing under the said mortgage with the interest thereon up to the time of the assignment and all proper mortgagees' costs and expenses.

20. After the repayment, with interest as aforesaid, of the special outlay and the payment in full of all moneys to be secured by Lanman & Kemp's mortgage, the said net profits shall each year be applied first in payment *pari passu* of the said annuities of £400 and £200, mentioned in clause 17 hereof, so long as the same shall respectively be subsisting, and subject thereto in payment from time to time of a dividend on the shares in the projected company, and the dividends which shall be payable in respect of the said shares to be numbered from 1 to 7,494 inclusive, shall be applied in the first place in repayment of the sum of £7,906 or thereabouts, mentioned in the second schedule hereto as owing to the

New Colonial Co. v. Canovanas Sugar Factory.

Colonial Company Limited, and interest thereon at the rate of 6 per centum per annum, to be computed as to £3,406 1s. 4d. part thereof from the 30th September, 1882, and as to the four instalments of £1,125 each, other part thereof, from the dates on which the same respectively fall due, and in the next place in or towards the repayment of the sum of 172,457.17 dollars mentioned in the same schedule or such other sum as may be found to be actually owing by the parties hereto of the first three parts to the said liquidating firm of Latimer & Co., and any sum which may be found to be owing by the said parties hereto of the first three parts as representatives of the said George Latimer deceased to the said Marqués de la Esperanza.

21. After the said several sums of £7,906 or thereabouts, and the interest thereon, and 172,457.17 dollars or thereabouts, and any sum which may be found owing as aforesaid to the Marqués de la Esperanza, shall have been fully satisfied, the said shares to be numbered from 1 to 2,498 inclusive and belonging to the said Marqués de la Esperanza shall (subject to the discharge by the Marqués de la Esperanza of any claims which the Colonial Company Limited may have against him, it being agreed between them and him that they shall have a lien upon the said shares for any such claims) be retransferred to the Marqués de la Esperanza or as he shall direct, but the said shares to be numbered from 2,499 to 4,996 inclusive, and belonging to the said Charles Alexander Hoard, shall remain in the names of the Colonial Company Limited, or their nominees, until the Colonial Company Limited shall have received out and by means of the accruing and future dividends thereon the sum of 114,583 dollars mentioned in the 2d schedule hereto, and when the last-mentioned sum shall in manner aforesaid have been fully satisfied, the last-mentioned shares shall be retransferred to the said Charles Alexander Hoard, or as he shall direct, and the said shares to be numbered from 4,997 to 7,494 inclusive, and belonging to the said William Henry Latimer, shall remain in the name or names of the Colonial Company Limited, or their nominees, until the Colonial Company Limited shall have received out or by means of the accruing and future dividends thereon the sum of 192,583 dollars mentioned in the 2d schedule hereto, and when the last-mentioned sum shall in manner aforesaid have been fully satisfied, the last-mentioned shares shall be retransferred to the said William Henry Latimer, or as he shall direct.

22. Whilst any of the said shares, to be numbered from 1 to 7,494 inclusive, shall be registered in the name or names of the Colonial Company Limited or their nominees, the corporation, or persons in whose name or names the same respectively shall for the time being be so registered, shall be at liberty to exercise all rights and privileges, annexed or incident to the holding of the said shares, in the same manner as if the corporation or persons in whose name or names the same respectively shall for the

New Colonial Co. v. Canovanas Sugar Factory.

time being be so registered was, or were, absolutely entitled thereto, and
the said Marqués de la Esperanza, Charles Alexander Hoard, and William
Henry Latimer, or any of them had not any interest therein.

As witness

------

### THE FIRST SCHEDULE ABOVE REFERRED TO.

#### PARTICULARS OF PROPERTY.

All those the farms, plantations, or estates formerly the property of the
late George Latimer, deceased, known by the names of Punta and San
Ysidro, situated in the district of Loiza, in the island of Porto Rico, with
the Central Sugar Factory of Canovanas erected on a portion thereof, and
all other the buildings, sheds, railways, machinery, plant, tools, implements,
and other effects, live and dead stock, and all other the property of whatever
description in, upon, or about the same as now existing, and which, or
some portion thereof, was in and by a certain mortgage, or public instru-
ment of mortgaging obligation, executed by the Sucesión of Don Jorge
Latimer y Compañía, dated the 4th day of June, 1879, mortgaged to Lan-
man & Kemp, to secure a sum of $200,000, and a portion of which property
known as the Central Sugar Factory of Canovanas was afterwards, by a
public deed of sale, dated the 30th day of October, 1879, sold and con-
veyed by the said Sucesión to Edward Kemp, and by him by lease of same
date leased to the said Sucesión.

------

### THE SECOND SCHEDULE ABOVE REFERRED TO.

STATEMENT OF SUMS PAYABLE AFTER PAYMENT IN FULL OF LANMAN & KEMP'S.
DEBT.

| | £ | s. | d. |
|---|---|---|---|
| Amount due by the executors of G. Latimer, deceased, to the Colonial Company Limited— | | | |
| Back instalments and interest thereon to 30th September, 1882 | 3,406 | 1 | 4. |
| Four instalments of £1,125 each, due 1st August, 1883, 1884, 1885, and 1886 | 4,500 | 0 | 0· |
| £ | 7,906 | 1 | 4 |

Amount due by Punta estate to the estate of Messrs. Lat'mer
& Company, as per balance sheet, 31st December, 1881 $ 172,457   17

New Colonial Co. v. Canovanas Sugar Factory.

Amount due by the executors of G. Latimer, deceased, to the Marqués of Esperanza, being so much of the sum of .. £ 10,000 . 00 as the Marqués of Esperanza shall have paid to the Colonial Company, Limited, in excess of his own moiety (of £10,000) under a joint and several guarantee of the debt of Latimer & Company, to the amount of £20,000, signed by the Marqués of Esperanza, and by the late George Latimer, and dated Porto Rico, 12th March, 1874.

Amount due by Charles Alexander Hoard to the Colonial Company, Limited ................. ............... $ 114,582 . 00 (charged on the future profits of the Canovanas Factory, by deed dated San Juan, 23d November, 1879).

Amount due by William Henry Latimer to the Colonial Company, Limited ............. .................... $ 192,583 . 00 (charged on the future profits of the Canovanas Factory, by the above-named deed, dated San Juan, 23d November, 1879).

Amount due by the "Sucesión de D. Jorge Latimer & Company," to the "Marqués de la Esperánza," for a payment made by him to Lanman & Kemp, to be repaid to said Marqués de la Esperanza, out of the first profits after paying Lanman & Kemp, American Gold....... $ 30,000 . 00

Amount due by the "Sucesión of D. Jorge Latimer & Company" to Borda & Company, for payment made by them to Lanman & Kemp ............................. $ 55,000 . 00

The undersigned accept and approve of the contents of the foregoing agreement on condition that the annuity to C. A. Hoard be paid quarterly in advance to date from January 1st, 1883.

| | |
|---|---|
| W. H. Latimer, | El Marqués de la Esperanza, |
| Executor of George Latimer, | *p.p.* F. L. Benet. |
| deceased. | W. H. Latimer. |
| W. H. Latimer, | W. Borda. |
| Liquidator of the estate and | Chas. A. Hoard. |
| affairs of the firm of Latimer | La Sucesión de Don Jorge Latimer & |
| & Company. | Company. |

Witness of the above signatures,

Polus J. Padilla.
Julian E. Blanco.

New Colonial Co. v. Canovanas Sugar Factory.

Accepted and approved, the amount due Lanman & Kemp, being as of September 30th, Eighteen hundred and eighty-two, sixty-eight thousand three hundred and eight (£68,308 0s. 0d.) pounds sterling as heretofore stated between the parties hereto.

Dated New York, March 22d, 1883.

Witnesses—                                          Lanman & Kemp.
    Abraham F. Downing.                               L. & K. No. 5.
    F. Brouwer Ancher.                                Edward Kemp.

Sealed with the common seal of the said Colonial Com- ⎫
    pany, Limited, by Benjamin Brown, the secretary of   |        The
    the said company, by order of the directors of the   |     Colonial
    said company, and in the presence of the under-      |     Company,
    signed witnesses, being two of the directors of the  ⎬     Limited.
    said company.                                        |
                                                         |   Benjn. Brown,
                    Frederic Lubbock,                    |      Secretary.
                    P. N. Bernard,                       |
                            Directors.                   ⎭

An agreement made the fourth day of December, 1902, between the Cano-vanas Sugar Factory, Limited, whose registered office is at 20 Eastcheap in the city of London (hereinafter referred to as "the Canovanas Com-pany") of the one part, and the New Colonial Company, Limited, whose registered office is at the same place (hereinafter referred to as "the Colonial Company") of the other part.

Whereas the Colonial Company are the managers and consignees of the estates in Porto Rico and business of the Canovanas Company, under the terms and conditions of an agreement dated third day of February, one thousand eight hundred and eighty-three for a term which will expire on the third day of February, one thousand nine hundred and three, but which term has, by agreement between the two companies, as evidenced by the letters which passed between them on the nineteenth day of June last, been extended for the further period hereinafter mentioned, and for the purpose of carrying out such agreement.

It is hereby agreed as follows:

1. The management of the business of the Canovanas Company by the Colonial Company shall be continued under the existing terms and con-ditions in every respect, for the term of five years, as from the expiration of the twenty-years term on the third day of February, one thousand nine hundred and three, under the provisions of the existing agreement of the third day of February one thousand eight hundred and eighty-three, and,

New Colonial Co. v. Canovanas Sugar Factory.

after the expiration of such five years, from year to year until determined on the thirtieth day of September in any year by either party giving to the other six calendar months' previous notice in writing; provided always that any notice given to the Canovanas Company shall not be effective and come into operation, except on condition of that company paying, before the expiration of the notice, all amounts owing by it to the Colonial Company under the said agreement of the third day of February, 1883, or under any other agreement or on any account whatsoever, whether secured or not.

As witness the common seals of the said companies the day and year first aforesaid.

The common seal of the Canovanas Sugar Factory was, pursuant to a resolution of the board of directors, duly passed on the 1st day of December, 1902, hereto affixed in the presence of    **L. S.**

    (sd.)   F. Lubbock,
    (sd.)   B. Brown,
          Directors.
               (sd.)   Frank Preston, Secretary.

The common seal of the New Colonial Company, Limited, was, pursuant to a resolution of the board of directors, duly passed on the 4th day of December, 1902, hereto affixed in the presence of    **L. S.**

    (sd.)   N. Lubbock,
    (sd.)   E. Packard,
          Directors.
           . (sd.)   Benj. Brown, Secretary.
Witnesses:

                  (sd.)   Geo. M. Ohlson,
                20 Eastcheap, London, E. C.
          Clerk to the New Colonial Company, Limited.